O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| QS WHOLESALE, INC.,<br><br>    Plaintiff,<br><br>  vs.<br><br>WORLD MARKETING, INC.,<br><br>    Defendant. | Case No.: SA 12-CV-0451(RNBx)<br><br>**ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, and DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

    Before the Court are two motions: (1) Plaintiff QS Wholesale's ("Plaintiff's" or "Quiksilver's") Motion for Partial Summary Judgment (Dkt. 150); and (2) Defendant World Marketing's ("Defendant's" or "WMI's") Motion for Partial Summary Judgment (Dkt. 154). Oral arguments were presented to the Court on May 6, 2013. After considering the moving papers and oral arguments, this Court GRANTS IN PART and DENIES IN PART Plaintiff's motion, and DENIES Defendant's motion.

## I. Background

Since this action involves a former *Baywatch* star,[1] perhaps the Court should not be surprised that the parties continue to generate a great deal of heated conflict even as the plotline of this case has meandered and the audience has shrunk.

In this trademark infringement action, both Defendant WMI's VISITOR mark and Plaintiff Quiksilver's VSTR mark are registered for use in connection with men's clothing and apparel. Def's Statement of Uncontroverted Facts and Conclusions of Law ("Def's SUF") (Dkt. 154-1) ¶¶ 2-3, 6-8.  WMI obtained registration in 1998 of the mark VISITOR in connection with men's shirts, pants, shorts, sports jackets, and t-shirts, while Quiksilver obtained registration in 2011 of the mark VSTR in connection with shirts; Quiksilver has also applied to register the VSTR mark in connection with other apparel such as pants, shorts, jackets, and swimwear. *Id.* ¶¶ 4, 6-8. Defendant WMI began selling VISITOR branded clothing and apparel in 1987; Plaintiff Quiksilver began selling VSTR-branded goods on or about June 17, 2011. *Id.* ¶¶ 2, 7.

### a. Quiksilver attempts to buy the VISITOR mark from WMI

Quiksilver originally planned to use the name "Visitor" for its VSTR brand.   Declaration of Neil K. Roman ("Roman Decl.") (Dkt. 168-2) Exs. R (38:19-40:9), S (100:4-14), T (25:12-20), and U (31:19-25).   During development of the brand in 2009 and 2010, Quiksilver executives and agents referred to the brand as "Visitor" or "KS Visitor," since it was inspired by the world travels of professional surfer (and aforementioned *Baywatch* star) Kelly Slater. *Id.* Exs. V-X, R (38:19-40:9), Z (83:16-84:13), and QQ.  Quiksilver, however, learned in February 2010 that WMI had already registered the VISITOR mark for use in connection with clothing and apparel. *Id.* Exs. S (179:5-15) and U (31:8-33:16); *see also id.* Ex. BB (February 12, 2010, email of Craig Stevenson, Quiksilver Global Brands President expressing dismay at the discovery of WMI's mark).

At that point, in April or May of 2010, Quiksilver reached out to WMI and attempted to purchase the VISITOR mark; between May of 2010 and February of 2012, the parties

---

[1] Kelly Slater, the celebrity face of Quiksilver's "VSTR" brand of clothing, co-starred in that groundbreaking series from 1992-93.  *See* http://www.imdb.com/name/nm0005440/?ref_=sr_1.

exchanged offers, but, ultimately, they did not agree on a price. *Id.* Ex. CC (Quiksilver's offers ranged from $60,000 to $250,000); *see also id.* Exs. S (240:16-249:20), X, DD.  While a sale of the mark was discussed, neither party alleges that they ever discussed the possibility of Quiksilver obtaining a license to use the mark.  Quiksilver presents no evidence that the potential of a lawsuit was ever discussed during these communications between the parties, and never suggests that Quiksilver or WMI characterized them as anything other than business communications regarding the potential purchase of a trademark.

### b. The present litigation commences

On March 8, 2012, after Quiksilver's VSTR line began appearing on the market, WMI sent Quiksilver a letter demanding that Quiksilver discontinue use of its VSTR mark. Def's SUF ¶ 9.  On March 21, 2012, Quiksilver filed the present Complaint (Dkt. 1) seeking a declaratory judgment, pursuant to 28 U.S.C. § 2201(a), "that Quiksilver's use of the VSTR mark does not infringe or dilute any valid and protectable trademark owned by [WMI], nor does it constitute unfair competition or false designation of origin." Compl. ¶ 22. WMI filed counterclaims for trademark infringement under the Lanham Act and pendant state law claims, seeking as relief (1) cancellation of the VSTR mark; (2) injunctive relief; (3) actual damages under the Lanham Act; (4) Quiksilver's profits; and (5) attorney's fees and costs.  *See* Def's Answer and Counterclaims (Dkt. 15).

### c. Quiksilver loses money and shuts down the VSTR brand

VSTR was not a success.  Quiksilver submitted expert testimony showing that the company lost $1,268,136 on the VSTR brand during the fiscal year ending October 31, 2011, and lost $2,170,158 during the fiscal year ending October 31, 2012.  Pl's Mot. at 4.  WMI does not appear to dispute these figures.  Sometime after Andrew Mooney became the new CEO of Quiksilver on January 13, 2013, he made the decision to shut down the VSTR brand.  *Id.* at 7.  On March 8, 2013, he sent a letter to WMI informing them of this decision.  *Id.*  While the brand is currently "shut down" and Quiksilver "has no plans to design, manufacture, advertise, and/or distribute any new product under the VSTR mark," Decl. of Brent H. Blakely (Dkt. 167-1) ¶ 4,

Quiksilver does still intend to "sell[] off pre-existing inventory." Pl's Opp'n to Def's Mot. (Dkt. 167) at 6.

### d. The current motions are filed

On April 8, 2013, Quiksilver filed a Motion for Partial Summary Judgment (Dkt. 150), arguing, first, that there can be no damages recovered for any cause of action, and, second, that WMI's counterclaim for injunctive relief is moot in light of the fact that the VSTR brand has been shut down. *See* Pl's Mot. Also on April 8, 2013, WMI filed its own Motion for Partial Summary Judgment (Dkt. 154), arguing that Quiksilver's claims for declaratory relief are moot. *See* Def's Mot. Oppositions and replies were filed by each party, and oral arguments were presented to the Court on May 6, 2013.

## II. Legal Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the opposing party must set out specific facts showing a genuine issue for trial; merely relying on allegations or denials in its own pleading is insufficient. *See Anderson,* 477 U.S. at 248-49. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *Id.* The Supreme

Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Anderson*, 477 U.S. at 252. A court is "not required to comb the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001).

### III. Discussion

#### a. Plaintiff Quiksilver's Motion for Partial Summary Judgment

##### i. Damages

###### 1. WMI concedes that it cannot recover Quiksilver's net profits, lost sales on WMI's VISITOR products, or corrective advertising damages

Because WMI "concedes that Quiksilver has not earned net profits on sales of VSTR products and that World Marketing is unable to prove specific lost sales of VISITOR-branded goods caused by consumer confusion," and that WMI "also does not seek damages in the form of corrective advertising," *see* Def's Opp'n at 7 n.7, the Court GRANTS Plaintiff Quiksilver's Motion for Partial Summary Judgment as to those issues.

At hearing, WMI's counsel also conceded that, because WMI's Fourth Claim of unfair competition pursuant to California Business and Professions Code § 17200 (the "UCL") could only ever result in restitution damages, which WMI does not seek, Plaintiff's Motion for Summary Judgment should also be granted as to damages pursuant to that Fourth Claim.

Accordingly, the Court finds that:

- WMI is not entitled to any lost sales on VISITOR products;
- WMI is not entitled to a disgorgement of Quiksilver's profits;
- WMI is not entitled to any damages for corrective advertising;
- WMI is not entitled to any damages under the California UCL.

###### 2. Reasonable Royalties

Quiksilver argues that, as a matter of law, WMI cannot be awarded "reasonable royalties" in the absence of a prior licensing contract or licensing negotiations between the parties. WMI,

in response, argues that a record of past negotiations regarding the *sale* of the VISITOR mark, along with an expert analysis of the value of licensing agreements between similarly situated third parties, provides a basis for royalties to be determined with reasonable certainty. While this is a close question, with no direct Ninth Circuit precedent and courts across the country expressing conflicting views on the issue, the Court finds that the facts of this case and related policy considerations weigh in favor of a possible recovery of reasonable royalties.

Reasonable royalties, which are a calculation of the hypothetical licensing royalties that an infringer would have paid to the senior owner of a mark, can be recovered as a measure of damages in trademark infringement cases. *See Quia Corp. v. Mattel, Inc.*, 2011 WL 2749576, at *6-7 (N.D. Cal. July 14, 2011)*; see also Tovan Ltd. v. Pfizer, Inc.,* No. CV–98–0094 LGB (MCx) 2000 WL 709149, at *16 (C.D.Cal. May 23, 2000) (citing cases). They are a form of damages for lost profits, since they focus on the licensing fees that were never paid by an infringer using a party's mark, and like other modes of calculating lost profits, they must be proved with "reasonable certainty." *See Tovan*, 2000 WL 709149, at *17 (citing *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993) ("Trademark remedies are guided by tort law principles. . . . [A]s a general rule, damages which result from a tort must be established with reasonable certainty.")).

Because of the "reasonable certainty" requirement, reasonable royalties are most often granted in a trademark context where the parties had a prior licensing arrangement, *see, e.g., A & H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc.,* 166 F.3d 197 (3d Cir.1999) ("Even when the courts have awarded a royalty for past trademark infringement, it was most often for continued use of a product beyond authorization, and damages were measured by the license the parties had or contemplated."), or where the plaintiff previously had engaged in the practice of licensing the mark to a third party, *see Sands, Taylor & Wood v. Quaker Oats Co.,* 978 F.2d 947 (7th Cir.1992).

As a result, some courts have held that "[w]here a plaintiff has failed to present evidence of an intent to license its trademark, a reasonable royalty analysis necessarily is speculation" and royalties cannot be recovered. *Quia*, 2011 WL 2749576, at *7 (citing *Trovan,* 2000 WL 709149;

*Tokidoki, LLC v. Fortune Dynamic, Inc.,* 2009 WL 2366439 (C.D.Cal. July 28, 2009)). The Ninth Circuit has made no such categorical statement, however, finding only more generally that "[i]n the absence of a legitimate proposed basis on which to calculate a royalty, awarding a reasonable royalty . . . would be impermissibly speculative." *M2 Software Inc. v. Viacom Inc.*, 223 F. App'x 653, 655 (9th Cir. 2007) (and otherwise stating that "we need not decide more generally whether reasonable royalties can be a measure of a plaintiff's damages in a trademark case, as other circuits have found appropriate in some cases").

However, "[e]ven in cases without [prior licensing] agreements . . . courts have awarded or approved of 'reasonable royalty' damages if the evidence provides a sufficiently reliable basis from which to calculate them." *Gucci Am., Inc. v. Guess?, Inc.*, 858 F. Supp. 2d 250, 254 (S.D.N.Y. 2012); *see also Adidas Am., Inc. v. Payless Shoesource, Inc.,* No. 01 Civ. 1655, 2008 WL 4279812, at *12 (D.Or. Sept. 12, 2008); *Sands, Taylor & Wood v. Quaker Oats Co.,* 34 F.3d 1340, 1343 (7th Cir. 1994); *Coryn Group II v. O.C. Seacrets,* 2010 WL 1375301, at *8 (D. Md. Mar. 30, 2010); *Buzz Off Insect Shield, LLC v. S.C. Johnson & Son, Inc.,* 606 F.Supp.2d 571, 585 (M.D.N.C. 2009); *Clear Blue, Inc. v. Clear! Blue, Inc.,* 2008 WL 5232897, at *4–5 (W.D.N.C. Dec. 12, 2008). In *Adidas*, for example, a case within the Ninth Circuit, even when no previous licensing agreement existed between the plaintiff and the defendant, and the plaintiff "concede[d] that it would not have licensed the marks to [defendant] Payless," the court upheld a jury's reasonable royalties award that was "consistent with royalties between adidas or Payless with third parties and also with royalties between third parties." *Adidas*, 2008 WL 4279812, at *12.

Here, while there is no prior licensing agreement between the parties, and there is no history of WMI ever licensing the VISITOR mark to any third parties, there is a detailed record of business negotiations between Quiksilver and WMI regarding the outright *purchase* of the mark by Quiksilver. *See* Roman Decl. Ex. Q1 ¶¶ 31-39. There were nearly two years of negotiations between March 2010 and February 2012 during which Quiksilver made offers from $60,000 to $250,000 to obtain permanent rights to the VISITOR mark. *Id.* Exs. X, CC-DD, PP, S (240:16-249:20). Emails from Quiksilver executives show that the company was "trying to

negotiate to buy [the VISITOR mark] at a fair and reasonable price," *id.* Ex. X, and that WMI made counteroffers, *id.* Ex. CC.[2]

WMI presents expert testimony describing the similarity between an agreement to sell a trademark and an agreement to issue a long-term, exclusive license for that mark. *Id.* Ex. Q1 (Declaration of Dr. Varner) ¶¶ 114-15. WMI's expert arrived at a reasonable royalty estimate of

---

[2] Quiksilver argues, albeit briefly and unsuccessfully, that Quiksilver's attempts to purchase the VISITOR mark from WMI should be considered "part of a settlement negotiation" and are thus inadmissible. Pl's Reply at 8. In support of this contention, Quiksilver offers a single citation to an inapposite state fraud case that discusses the litigation privilege in state court proceedings pursuant to California Civil Cod § 47(b), *see Navarro v. IHOP Properties, Inc.*, 134 Cal.App.4th 834, 844 (2005), which of course does not apply in this federal proceeding. Federal Rule of Evidence 408 provides that:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

In order for the evidence of Quiksilver's offers to purchase the VISITOR mark to be inadmissible under Rule 408, the communications "must include reference to 'valuable consideration,' and *there must be a disputed 'claim' already existent*." *United States v. Mirama Enterprises, Inc.*, 185 F. Supp. 2d 1148, 1156-57 (S.D. Cal. 2002) (emphasis added). Furthermore, Quiksilver must make a "substantial showing" that the communications "[were], in fact, part of a settlement attempt." *Id.* (quoting *Raybestos Products Co.,* 54 F.3d 1234, 1241 (7th Cir. 1995)). Here, Quiksilver has made no such showing. In May of 2010, when Quiksilver made its initial purchase offer, WMI could not have even known of the existence of Quiksilver's as-yet-unproduced product, let alone been contemplating a settlement with the company. Rather, Quiksilver's overture was a regular business-related correspondence, an attempt to establish what the mark was worth to its owner and whether or not Quiksilver would be willing to pay that amount.

There is no evidence that the potential for litigation was ever discussed between Quiksilver and WMI as these offers were being exchanged, and the final Quiksilver offer predates not only the commencement of this litigation (by Quiksilver, not WMI), but also the first cease-and-desist letter sent by WMI to Quiksilver after the VSTR product was already on the market in March of 2012. While there exists the possibility that later negotiations, closer to the 2012 commencement of litigation, might have begun to be colored by the threat of a civil action, Quiksilver has not made a "substantial showing" that this was the case. *See Big O Tire Dealers, Inc v. Goodyear Tire & Rubber Co,* 561 F.2d 1365, 1372 (10th Cir. 1977) (in a trademark dispute, upholding the introduction of "business communications" regarding the mark because negotiations had not "crystallized to the point of threatened litigation").

1 between $129,984 and $514,855 in this case, a range that tracks the offers and counteroffers
2 made during the parties' purchasing negotiations. *Id.* Ex. Q1 ¶¶ 99-120.  In addition, these
3 proposed royalty rates track similar licensing agreements in clothing industry deals examined by
4 WMI's expert. *Id.* Ex. Q1 ¶¶ 55-60; *see also Adidas*, 2008 WL 4279812, at *12 (finding
5 reasonable royalties appropriate in light of the rates' consistency with "royalties between third
6 parties").

7    Because of the unique facts of this case – the Court has seen no other court analyze
8 reasonable royalty rates in light of prior negotiations to *purchase* a mark – the Court finds it
9 distinguishable from those cases that denied reasonable royalties in the absence of prior
10 licensing negotiations between the parties. *Cf. Quia*, 2011 WL 2749576, at *7; *Trovan,* 2000
11 WL 709149; *Tokidoki,* 2009 WL 2366439.  The presence of detailed and lengthy purchasing
12 negotiations may provide the same "reasonable certainty" regarding royalties that licensing
13 negotiations would provide in another case.  As a result, WMI has established a genuine issue of
14 material fact as to the amount and character of alleged lost royalties, and the Court will not find
15 that, as a matter of law, any award of such royalties would be impermissibly speculative.

16    As a policy matter, the Court finds this result in congruence with the trademark law's
17 function: it takes the economic incentive out of infringement and promotes a fair and
18 competitive marketplace.  Assuming infringement, at the moment the VSTR line went to
19 market, Quiksilver benefitted not only from whatever profits would follow, it also benefitted, in
20 a concrete financial way, from the $250,000-$500,000 that it *did not have to pay* to WMI for use
21 of the mark.  That economic benefit does not disappear with the failure of VSTR to turn a profit.
22 If reasonable royalties were not available, large corporations could "feel out" the terms of a
23 purchase agreement or a long-term license agreement with a smaller competitor, then back out
24 when the price gets too high and count on a financial windfall stemming from their own
25 nonpayment in the event that the infringement does not create disgorgeable profits.  Such a rule
26 would also necessarily impact the pre-infringement negotiating power of the parties as they try
27 to arrive at a fair price for the purchase or licensing of a mark—without the prospect of

28

reasonable royalties, a smaller trademark owner would be pushed to lower its asking price to take into account the economic incentives of infringement.

Accordingly, the Court DENIES Plaintiff Quiksilver's Motion for Partial Summary Judgment as to the issue of reasonable royalties.

### 3. Goodwill Damages

Quiksilver argues that "WMI has offered no evidence whatsoever indicating that it lost any goodwill [or] suffered injury to its reputation" that would result in damages. Pl's Mot. at 14 (citing *Cellularm Inc. v. Bay Alarm Co.*, 1991 WL 332052, at *7 (N.D. Cal. Apr. 11, 1991)). Where a plaintiff seeks damages for injuries to the plaintiff's business, including damages based on a loss of goodwill, "the burden is on the plaintiff to come forward with evidence establishing that defendant's infringing conduct caused the injuries for which the plaintiff seeks compensation." *Cellularm*, 1991 WL 332052, at *7 (citing *Harper House, Inc. v. Thomas Nelson, Inc.,* 889 F.2d 197, 210 (9th Cir.1989)). "In a suit for damages . . . actual evidence of some injury *resulting from the deception* is an essential element of plaintiff's case." *Harper House,* 889 F.2d at 210 (emphasis original) (applying section 43(a) of the Lanham Act).

The Court agrees with Quiksilver. WMI suggests that two instances of confusion, where colleagues in the apparel business appear to have confused VSTR products with WMI's VISITOR products, establish a presumption of compensable injury to WMI's goodwill in the industry. *See* Def's Opp'n at 21-22. Quiksilver correctly points out that WMI's authority for this proposition is inapposite. WMI cites to *Citizens Financial Group, Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 131 (3d Cir. 2004), and *Int'l Kennel Club of Chicago, Inc. v. Mighty Star Inc.*, 846 F.2d 1079, 1091 (7th Cir. 1988), two cases that dealt with the availability of injunctive relief based on a showing of infringement.

Here, in the context of damages, the Ninth Circuit requires that Plaintiff present specific evidence that would establish monetary damages with "reasonable certainty," *see Lindy Pen*, 982 F.2d at 1407, and WMI only offers conclusory and speculative assertions that "Quiksilver's use of the VSTR mark injured World Marketing by depriving World Marketing of control over the way consumers perceive its VISITOR brand," Def's Opp'n at 22, along with expert

speculation that consumer confusion "might associate the VISITOR mark with surfing – thus making it more difficult for World Marketing to sell non-surf products," *id.* at 22 n.14. These statements do not establish monetary damages with reasonable certainty.

Accordingly, Quiksilver's Motion for Partial Summary Judgment as to goodwill damages is GRANTED.

### ii. Injunctive relief

Quiksilver argues, in a one-paragraph coda to its Motion for Partial Summary Judgment, that WMI's claim for injunctive relief is moot "because, as set forth in Mr. Mooney's letter, Quiksilver is shutting down the 'VSTR' brand." Pl's Mot. at 15.

While the cessation of unlawful conduct can moot a claim for injunctive relief, "the reform of the defendant must be irrefutably demonstrated and total." *Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir. 1986) (citing 2 J. McCarthy, *Trademarks and Unfair Competition* § 30:6, at 471 (2d ed. 1984)). Here, there is currently no legally binding guarantee that Quiksilver will never revive the brand. Indeed, Quiksilver states in its own briefing that a "declaration of non-infringement would allow Quiksilver to assign or otherwise transfer the VSTR marks to a third party," Pl's Opp'n (Dkt. 167) at 8, and that Quiksilver still intends to "sell[] off pre-existing inventory," *id.* at 6. Such actions would absolutely be subject to any injunction issued pursuant to a finding of infringement.

Accordingly, the Court finds that WMI's claim for injunctive relief is not moot, and DENIES Quiksilver's Motion for Partial Summary Judgment on that issue.

### b. Defendant WMI's Motion for Partial Summary Judgment mooting Quiksilver's Declaratory Judgment Claim

Even while opposing Plaintiff Quiksilver's mootness argument in the context of injunctive relief, WMI submits its own Motion for Partial Summary Judgment arguing that Quiksilver's claim for a declaratory judgment of non-infringement is moot . . . because Quiksilver has shut down the VSTR brand. Def's Mot. at 1. Highlighting a questionable rhetorical strategy of opposing-at-all-costs incoherence, the parties' disagreements regarding this motion simply place each of them on the opposite side of the mootness issue discussed above.

The Court comes to the same conclusion as in the previous section. A justiciable case or controversy still exists, and Quiksilver's non-binding, potentially-temporary abandonment of the VSTR brand does not moot an otherwise valid claim for declaratory relief. As long as Quiksilver still expects to sell off VSTR-branded inventory and potentially assign or transfer VSTR marks to a third party, Plaintiff's claims for a declaration of non-infringement are not moot.

Accordingly, WMI's Motion for Partial Summary Judgment is DENIED.

**IV.   Disposition**

For the reasons stated above, the Court GRANTS IN PART and DENIES IN PART Plaintiff Quiksilver's Motion for Partial Summary Judgment, DENIES Defendant WMI's Motion for Partial Summary Judgment, and ORDERS as follows:

1) Regarding damages,
   a. WMI is not entitled to any damages for lost sales on VISITOR products;
   b. WMI is not entitled to a disgorgement of Quiksilver's profits;
   c. WMI is not entitled to any damages for corrective advertising;
   d. WMI is not entitled to any damages under it Fourth Cause of Action (UCL);
   e. WMI is not entitled to damages based on loss of goodwill; but
   f. Summary judgment is DENIED as to "reasonable royalties."
2) Regarding injunctive relief, the Court finds that WMI's counterclaim seeking an injunction is not moot.
3) Regarding declaratory relief, the Court finds that Quiksilver's claim for a declaratory judgment of non-infringement is not moot.

DATED: May 9, 2013

_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE