1  MICHAEL G. YODER (S.B. #83059)
   MOLLY J. MAGNUSON (S.B. #229444)
2  JEAN-PAUL P. CART (S.B. #267516)
   O'MELVENY & MYERS LLP
3  610 Newport Center Drive, 17th Floor
   Newport Beach, CA 92660-6429
4  Telephone:  (949) 760-9600
   Facsimile:   (949) 823-6994
5  Email:      myoder@omm.com
   Email:      mmagnuson@omm.com
6  Email:      jcart@omm.com

7  BRENT H. BLAKELY (SBN 157292)
   CINDY CHAN (SBN 247495)
8  BLAKELY LAW GROUP
   915 North Citrus Avenue
9  Hollywood, California 90038
   Telephone: (323) 464-7400
10 Facsimile: (323) 464-7410
   Email: bblakely@blakelylawgroup.com
11 Email: cchan@blakelylawgroup.com

12 Attorneys for Plaintiff and Counter-
   Defendant QS Wholesale, Inc. and Counter-
13 Defendant Quiksilver, Inc.

14

                UNITED STATES DISTRICT COURT

15              CENTRAL DISTRICT OF CALIFORNIA

16                   SOUTHERN DIVISION

17

18 QS WHOLESALE, INC., a California          Case No.  SACV12-00451 DOC (RNBx)
   corporation,
19                                           **QUIKSILVER'S CORRECTED
                        Plaintiff,           NOTICE OF MOTION AND
20                                           MOTION FOR NEW TRIAL
            v.                               PURSUANT TO FED. R. CIV. P. 59;
21                                           MEMORANDUM OF POINTS AND
   WORLD MARKETING, INC. a New               AUTHORITIES IN SUPPORT
22 Jersey corporation,                       THEREOF**

23                      Defendant.           **[[Proposed] Order and Declaration of
                                             Molly J. Magnuson Filed
24 AND RELATED COUNTERCLAIMS                 Concurrently Herewith.]**

25

26                                           Date:          September 24, 2013
                                             Time:          8:30 a.m.
27                                           Courtroom:     9D - Santa Ana
                                             Judge:         Hon. David O. Carter
28

1

2

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................... 1

II.    ARGUMENT ...................................................................................... 2

    A.    Quiksilver Is Entitled To A New Trial On The Issue Of Punitive Damages. ....................................................................... 3

        1.    The Jury's Award Of Punitive Damages Was Constitutionally Excessive. ........................................................ 3

        2.    It Was Prejudicial Error For The Court To Allow World Marketing To Introduce Evidence And Make Argument Regarding Quiksilver's Privileged Litigation Conduct In Support Of Its Punitive Damages Claim. ............................ 8

        3.    It Was Prejudicial Error For The Court To Allow World Marketing To Introduce Evidence And Make Argument Regarding Purported Harm Caused As A Result Of Quiksilver's Litigation Conduct. ......................................... 9

        4.    The Jury's Finding Of Malice, Fraud Or Oppression Is Against The Clear Weight Of The Evidence At Trial ..................... 11

    B.    Quiksilver Is Entitled To A New Trial On World Marketing's Claim For Reasonable Royalty Damages. ............................................ 12

        1.    In Support Of Its Reasonable Royalty Damages Theory, World Marketing Relied On Prejudicial And Irrelevant Arguments And Testimony Designed To Confuse And Inflame The Jury. ............................................................. 12

        2.    The Jury's Finding That World Marketing Was Entitled To Reasonable Royalty Damages Was Against The Clear Weight Of The Evidence ................................................. 13

    C.    Quiksilver Is Entitled To A New Trial On The Jury's Finding Of Willful Infringement .................................................................... 16

        1.    The Court's Instruction To The Jury On Consumer Confusion Is Contrary To The Law. ................................................. 16

        2.    The Court Failure To Instruct The Jury On The Law Regarding The Failure To Conduct A Survey Constitutes An Error In Law. ............................................................... 21

        3.    The Jury's Finding Of Willful Infringement Was Made On The Basis Of Improperly Admitted Evidence And Was Against The Clear Weight Of The Evidence .................................. 22

III.    CONCLUSION ................................................................................ 23

1

2

## TABLE OF AUTHORITIES

3

Page(s)

**CASES**

4

5

*A & H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc.*,
166 F.3d 197 (3rd Cir.1999) ............................................................... 14

6

*Anheuser-Busch, Inc. v. Nat. Beverage Distributors*,
69 F.3d 337 (9th Cir. 1995) .................................................................. 3

7

8

*BMW of N. Am. v. Gore*,
517 U.S. 559 (1996) .............................................................. 4, 5, 6, 7

9

10

*Brocade Commc'ns Sys. Inc. v. A10 Networks, Inc.*,
No. C 10–3428 PSG, 2013 WL 831528 (N.D. Cal. Jan. 10, 2013) ........ 3

11

12

*Clanahan v. McFarland Unified School Dist.*,
No. CV F 05-0796 LJO DLB, 2007 WL 2253597 (E.D. Cal. Aug. 3,
2007) ................................................................................................. 13

13

14

*Computer Access Tech. Corp. v. Catalyst Enters., Inc.*,
273 F. Supp. 2d 1063 (N.D. Cal. 2003) ................................................. 2

15

16

*Dreamwerks Prod. Group, Inc. v. SKG Studio*,
142 F.3d 1127 (9th Cir. 1998) ............................................................ 18

17

18

*Gill v. Rollins Protective Svc's*,
773 F.2d 592 (4th Cir. 1985) .............................................................. 11

19

20

*Global Mfg. Group, LLC v. Gadget Universe.Com*,
417 F. Supp. 2d 1161 (S.D. Cal. 2006) ................................................ 20

21

22

*Honda Motor Co. v. Oberg*,
512 U.S. 415 (1994) ............................................................................ 7

23

24

*Hunter v. County of Sacramento*,
652 F.3d 1225 (9th Cir. 2011) .............................................................. 3

25

26

*In re First Alliance Mortg. Co.*,
471 F.3d 977 (9th Cir. 2006) ............................................................... 3

27

28

ii

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.*,
   No. SACV 11–1309–DOC(ANx), 2013 WL 655314 (C.D. Cal. Feb. 21,
   2013) ................................................................................................ 16, 21

*JL Beverage Co., LLC v. Beam, Inc.*,
   899 F. Supp. 2d 991 (D. Nev. 2012) ............................................................ 20

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   No. 2:06–CV–348–TJW–CE, 2011 WL 7563818 (E.D. Tex. Jan. 7, 2011) ..... 15

*Lindy Pen v. Bic Pen Corp.*,
   982 F.2d 1400 (9th Cir. 1992) .................................................................... 22

*Lucent Technologies, Inc. v. Gateway, Inc.*,
   509 F. Supp. 2d 912 (S.D. Cal. 2007) ........................................................... 3

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) .................................................................. 15

*M2 Software, Inc v. Madacy Enter.*,
   421 F.3d 1073 (9th Cir. 2005) .................................................................... 18

*Molski v. M.J. Cable, Inc.*,
   481 F. 3d 724 (9th Cir. 2007) ..................................................................... 11

*Oracle USA, Inc. v. SAP AG*,
   No. C 07–1658 PJH, 2011 WL 3862074 (N.D. Cal. Sept. 1, 2011) ..................... 2

*Pac. Mut. Life Ins. Co. v. Haslip*,
   499 U.S. 1 (1991) ........................................................................... 4, 6, 7

*Playboy Ent., Inc. v. Netscape Commc'ns Corp.*,
   55 F. Supp. 2d 1070 (C.D. Cal. 1999) ..................................................... 16, 21

*QS Wholesale, Inc. v. World Marketing, Inc.*,
   No. SA 12–CV–0451(RNBx), 2013 WL 1953719 (C.D. Cal. May 9,
   2013) ................................................................................................ 10, 12

*Quia Corp. v. Mattel, Inc.*,
   No. C 10–1902 JF (HRL), 2011 WL 2749576 (N.D. Cal. July 14, 2011) ..... 14, 18

QUIKSILVER'S MOTION FOR NEW TRIAL
PURSUANT TO FED. R. CIV. P. 59

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Rearden LLC v. Rearden Commerce, Inc.*,
  683 F.3d 1190 (9th Cir. 2012) .................................................................18, 19, 20

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010) ...................................................................... 15

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
  59 F.3d 902 (9th Cir. 1995) ........................................................................ 20

*South Cone, Inc. v. Timex Corp.*,
  No. 99–CV–2384–L(AJB), 2002 WL 34450329 (S.D. Cal. April 10,
  2002) ......................................................................................................... 14

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) ............................................................................ passim

*Surfvivor Media, Inc. v. Survivor Prods.*,
  406 F.3d 625 (9th Cir. 2005) ...................................................................... 18

*Tokidoki, LLC v. Fortunate Dynamic, Inc.*,
  No. CV 07-1923 DSF (PJWx), 2009 WL 2366439 (C.D. Cal. July 28,
  2009) ..................................................................................................13, 14, 22

*Water Pik, Inc. v. Med-Systems, Inc.*,
  No. 10-01221, 2012 WL 27598 (D. Colo. Jan. 5, 2012) ........................................ 18

**STATUTES**

15 U.S.C. § 1117(b) ......................................................................................... 7

Cal. Civ. Code § 47(b) ..................................................................................... 9

**RULES**

Fed. R. Civ. P. 50(b) ........................................................................................ 1

Fed. R. Civ. P. 59 ....................................................................................... 1, 2, 23

Fed. R. Civ. P. 59(a) ........................................................................................ 2

Fed. R. Civ. P. 403 ......................................................................................... 20

QUIKSILVER'S MOTION FOR NEW TRIAL
PURSUANT TO FED. R. CIV. P. 59

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

    **PLEASE TAKE NOTICE** that on September 24, 2013, at 8:30 a.m., in Department 9D of the above-captioned court, located at 411 W. 4th Street, Santa Ana, California 92701, Plaintiff and Counter-Defendant QS Wholesale, Inc. and Counter-Defendant Quiksilver, Inc. (collectively, "Quiksilver") will, and hereby do, move the Court, pursuant to Rule 59 of the Federal Rules of Civil Procedure, for a new trial, as follows:

    A.    On Defendant and Counter-Claimant World Marketing, Inc.'s ("World Marketing") claim for punitive damages on the grounds that:

    (1)    The jury's award of $3,500,000 in punitive damages was constitutionally excessive;

    (2)    It was an error of law to admit into evidence and to allow argument regarding Quiksilver's litigation conduct in support of World Marketing's punitive damages claim because conduct in the course of litigation is absolutely privileged under the law;

    (3)    It was an error of law to admit into evidence and allow argument regarding lost sales allegedly caused by Quiksilver's litigation conduct that were not at issue, not recoverable and not relevant to any claim at issue in the case; and

    (4)    The jury's finding that Quiksilver acted with oppression, fraud, or malice was against the clear weight of the evidence at trial.

    B.    On World Marketing's claim for reasonable royalty damages on the grounds that:

    (1)    It was an error of law to admit into evidence and allow argument regarding lost sales allegedly caused by Quiksilver's litigation conduct that were not at issue, not recoverable and not relevant to any claim at issue in the case; and

    (2)    The jury's finding that World Marketing was entitled to reasonable royalty damages was against the clear weight of the evidence at trial.

QUIKSILVER'S MOTION FOR NEW TRIAL
PURSUANT TO FED. R. CIV. P. 59

C.     On World Marketing's claim that Quiksilver willfully infringed on World Marketing's trademark on the grounds that:

(1)     It was an error of law for the jury to be given an incorrect instruction on the definition of a "consumer", and it was, moreover, an error of law for World Marketing to be permitted to offer at trial evidence and argument regarding alleged consumer confusion based on irrelevant testimony, hearsay testimony and, even if relevant and admissible, testimony the probative value of which was substantially outweighed by unfair prejudice, and the risk of causing confusion of the issues and misleading the jury;

(2)     It was an error of law for the jury not to be instructed that World Marketing's failure to offer a consumer survey on likelihood of confusion warrants a presumption that the results of such a survey would have been unfavorable; and

(3)     The jury's finding that Quiksilver infringed on World Marketing's trademark was against the clear weight of the evidence at trial.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities attached hereto, the papers and pleadings on file in this case, the transcripts of the trial in this action, the exhibits introduced into evidence at the trial of this action, such other materials as the Court may consider, and the arguments of counsel at the hearing on this Motion.

//
//
//
//
//

QUIKSILVER'S MOTION FOR NEW TRIAL
PURSUANT TO FED. R. CIV. P. 59

1    DATED: August 19, 2013                MICHAEL G. YODER
2                                          MOLLY J. MAGNUSON
                                           JEAN-PAUL P. CART
3                                          O'MELVENY & MYERS LLP

4                                          By:  /s/ Michael G. Yoder___

5                                          BRENT H. BLAKELY
                                           CINDY CHAN
6                                          BLAKELY LAW GROUP

7                                          Attorneys for Plaintiff and
                                           Counter-defendant QS
8                                          Wholesale, Inc. and
                                           Counter-defendant Quiksilver, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

While QS Wholesale, Inc. and Quiksilver, Inc.'s (collectively, "Quiksilver")
Motion for Judgment As A Matter of Law Pursuant to Fed. R. Civ. P. 50(b) (the
"JMOL Motion") should be granted, as World Marketing, Inc. ("World
Marketing") has failed to present sufficient evidence to support its Counterclaims,
Quiksilver hereby requests that, in the alternative, the Court order a new trial on all
issues.  The verdict returned by the jury against was the product of several
fundamental errors in the types of evidence and arguments World Marketing was
permitted to present to the jury and a number of incorrect and incomplete jury
instructions on outcome determinative issues.  As a result, the jury's decision-
making process was irreparably tainted by passion and prejudice not permitted
under the law.  Indeed, World Marketing based its entire claim for punitive
damages—and its case for "harm" loosely speaking—on the fact that Quiksilver
initiated the present lawsuit (to seek a declaration of non-infringement) and issued
various subpoenas during discovery, all of which were privileged and inadmissible.
From opening statements through closing arguments, World Marketing—in
violation of the litigation privilege and applicable law—improperly claimed to have
lost over $3,200,000 in sales because Quiksilver was "trying to put [World
Marketing] out of business" by defending itself in this lawsuit.  This was the case
the jury heard and on which it based its verdict, not on evidence of: (1) potential
confusion by consumers of VSTR products (none was presented) or (2) World
Marketing's speculative reasonable royalty theory.

Yet even these two elements of World Marketing's claim were tainted by
improper argument and legal error.  For example, the jury was incorrectly
instructed that in applying the test for consumer confusion—the critical threshold
question in the case—it could consider hearsay and claims of "confusion" by World

QUIKSILVER'S MOTION FOR NEW TRIAL
PURSUANT TO FED. R. CIV. P. 59

Marketing's friends and employees, and retail accounts that admitted they would never consider selling VSTR products in their stores.  And World Marketing's reasonable royalty theory is rank speculation, as World Marketing has never licensed the VISITOR mark, had no interest in licensing it to Quiksilver, and there is no economic justifications upon which Quiksilver would have ever agreed to license the mark.  The result of this accumulation of impermissible arguments and legal errors was a grossly excessive and constitutionally impermissible award of punitive damages 28 times greater than compensatory damages, an award that bears no relation to the facts of the case, and which is contrary to well established legal authorities.

Accordingly, in the event the Court does not grant Quiksilver's JMOL Motion, it should order a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure and allow the present dispute to be heard and decided pursuant to the law and admissible evidence rather than inflammatory, unsubstantiated claims and speculation.

## II.   ARGUMENT

Under Federal Rule of Civil Procedure 59(a), a court may grant a new trial on all or some of the issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  In ruling on a motion for a new trial, unlike a motion for judgment as a matter of law, "[t]he court may weigh the evidence, assess the credibility of witnesses, and need not view the evidence in the light most favorable to the prevailing party."  *Computer Access Tech. Corp. v. Catalyst Enters., Inc.,* 273 F. Supp. 2d 1063, 1065-1066 (N.D. Cal. 2003).  Possible grounds for ordering a new trial include, among others: (1) where the verdict is not supported by sufficient evidence, *e.g., Oracle USA, Inc. v. SAP AG,* No. C 07–1658 PJH, 2011 WL 3862074, *11 (N.D. Cal. Sept. 1, 2011) (ordering new trial because evidence insufficient to support jury's damages award of "hypothetical license damages" based in part on "elicited self-serving testimony from [plaintiff's]

executives"); (2) where the court is sufficiently certain a jury award of damages is based on improperly considered evidence or an improper theory, *In re First Alliance Mortg. Co.*, 471 F.3d 977, 1001-02 (9th Cir. 2006) (new trial ordered because jury's damages calculation was based "in substantial part on an improper theory of damages"); (3) where the court finds a jury award of damages excessive as a matter of law, *Brocade Commc'ns Sys. Inc. v. A10 Networks, Inc.*, No. C 10–3428 PSG, 2013 WL 831528, *24-25 (N.D. Cal. Jan. 10, 2013) (finding jury's award of punitive damages excessive and ordering new trial); (4) where a party presents prejudicial testimony and improper argument to the jury, *e.g., Anheuser-Busch, Inc. v. Nat. Beverage Distributors,* 69 F.3d 337, 345-46 (9th Cir. 1995) (affirming order of new trial based on attorney's "prejudicial testimony" and "argument on subjects which the court had ruled to be inadmissible"); and (5) where the jury instructions fail to fairly and adequately cover the issues presented, misstate the law, or are incomplete or misleading, *e.g., Hunter v. County of Sacramento*, 652 F.3d 1225, 1232 (9th Cir. 2011) (ordering new trial despite district court's reliance on model jury instruction); *Lucent Technologies, Inc. v. Gateway, Inc.,* 509 F. Supp. 2d 912, 928 (S.D. Cal. 2007) (granting motion for new trial because of "a conflict in the jury instructions which may have provided an erroneous standard for the jury").

In the present case, a new trial is warranted for each of the reasons set forth below.

### A.    Quiksilver Is Entitled To A New Trial On The Issue Of Punitive Damages.

#### 1.    The Jury's Award Of Punitive Damages Was Constitutionally Excessive.

The jury's award of punitive damages of $3,500,000—amounting to *28 times* the compensatory damages awarded—is grossly excessive under well-established constitutional standards and, on its face, warrants a new trial on this issue. This is even more true when one considers that the award was the product, not of proper

admissible evidence of fraud, oppression or malice, but of improper, privileged and irrelevant claims at trial by World Marketing that Quiksilver sought to destroy it by filing this lawsuit and issuing subpoenas during the discovery process and, that as a result of the litigation, World Marketing has lost sales totaling $3,200,000. (*See infra* Section II-A(c).)  No doubt it was as a result of this improper and inflammatory argument that the jury returned a verdict in favor of World Marketing and issued a constitutionally excessive punitive damages award.

The Supreme Court has long expressed its concern that juries regularly grant awards that are grossly excessive and ignore that "elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will submit him to punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am. v. Gore*, 517 U.S. 559, 574 (1996); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417-18 (2003); *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 42 (1991) ("Punitive damages are a powerful weapon.  Imposed wisely and ***with restrain***, they have the potential to advance legitimate state interests.  Imposed indiscriminately, however, they have a devastating potential for harm.") (O'Connor dissenting) (emphasis added).  To avoid a miscarriage of justice, courts are required to review punitive damage awards based on three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the ratio between the award of punitive damages and the harm inflicted; and (3) the difference between the award of punitive damages and the civil penalties authorized or imposed in comparable cases.  *BMW*, 517 U.S. at 574.  Here, not one of these considerations supports the jury's excessive punitive damages award, which cannot stand as a matter of law.  A new trial is therefore warranted.

a.     **Quiksilver Did Not Engage In Reprehensible Conduct.**

It is widely regarded that "the most important indicium of reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's

QUIKSILVER'S MOTION FOR NEW TRIAL
PURSUANT TO FED. R. CIV. P. 59

conduct." *BMW*, 517 U.S. at 575. In assessing the defendant's conduct, courts have been instructed to consider whether: (1) the harm caused was physical or economic; (2) the tortious conduct evinced an indifference to or reckless disregard of the health or safety of others; (3) the target of the conduct had financial vulnerability; (4) the conduct involved repeated actions or was an isolated incident; and (5) the harm was the result of trickery or deceit or mere accident. *State Farm*, 538 U.S. at 418. Consideration of these important factors weighs heavily in favor of a finding that the award is constitutionally excessive. The alleged harm at issue, loss of royalty income to World Marketing, was purely economic and was based on a theory concocted by World Marketing's counsel in the absence of any actual harm. The trademark infringement found by the jury did not evince any indifference to or reckless disregard for the health or safety of others. World Marketing was not financially vulnerable. It is a successful company that has been in business for decades. (Magnuson Decl. Ex. 14 (Day 5 Vol.1 at 66:22-67:13, 71:13-18 (J. Mossberg Testimony)).) Neil Mossberg himself admitted at trial that the company has suffered no lost profits as a result of any confusion. (*Id*. at Ex. 2 (Day 2 Vol. 2 at 57:21-25 (N. Mossberg Testimony)).) And, at the end of the day, World Marketing was only seeking a maximum of $515,000 in total compensatory damages at trial. (*Id*. Ex. 12 (Day 5 Vol. 1 at 22:10-23 (Varner Testimony)).) It was also able to retain Covington & Burling, a major international law firm, to represent it in this case. Quiksilver, for its part, had no reason to believe World Marketing to be financially vulnerable.

Simply put, Quiksilver's alleged infringement on the VISITOR mark was not "reprehensible" under the standards set forth above.

b. **The Ratio Of Punitive To Compensatory Damages Awarded By The Jury Is Grossly Excessive.**

The jury's award of $3,500,000 in punitive damages is 28 times greater than the $125,000 compensatory damages awarded by the jury. This multiplier

QUIKSILVER'S MOTION FOR NEW TRIAL PURSUANT TO FED. R. CIV. P. 59

1  completely fails to comport with due process and is absolutely unnecessary to fulfill

2  the interests of punishment and deterrence in this case, the only two interests that

3  may be considered in awarding punitive damages. *State Farm*, 538 U.S. at 418 ("It

4  should be presumed a plaintiff has been made whole for his injuries by

5  compensatory damages, so punitive damages should only be awarded if the

6  defendant's culpability, after having paid compensatory damages, is so

7  reprehensible as to warrant the imposition of further sanctions to achieve

8  punishment or deterrence.").

9  　　　The jury's excessive award stands in stark contrast to the Supreme Court

10  holding that "***few awards exceeding a single-digit ratio between punitive and***

11  ***compensatory damages, to a significant degree, will satisfy due process***." *State*

12  *Farm*, 538 U.S. at 425 (emphasis added). The Supreme Court has moreover

13  recognized, many times over, that "***an award of four times the amount of***

14  ***compensatory damages might be close to the line of constitutional impropriety***."

15  *Id.* (noting the "long legislative history, dating back over 700 years and going

16  forward to today, providing for sanctions of double, triple, or quadruple damages to

17  deter and punish") (emphasis added); *BMW*, 517 U.S. at 581; *Haslip*, 499 U.S. at

18  23-24. And, while the Supreme Court has recognized that a higher multiplier may

19  be appropriate where compensatory damages are insignificant, such as in the case

20  of emotional distress damages, that is not the case here. The $125,000 in

21  compensatory damages awarded as lost royalty revenue is on par with World

22  Marketing's total operating income for 2011 or 2010, is four times greater than

23  World Marketing's net income for all of 2010, and certainly exceeds its net loss for

24  2011 (before the VSTR brand was fully launched and before this lawsuit was

25  initiated). (*See* Trial Ex. 155 at 3.)

26  　　　Although World Marketing will no doubt argue that an excessive award of

27  punitive damages is necessary to deter Quiksilver from future misconduct, the

28  "wealth of a defendant cannot justify an otherwise unconstitutional punitive

6

damages award." *State Farm*, 538 U.S. at 427; *BMW*, 517 U.S. at 591 (Breyer concurring) ("Wealth provides an open-ended basis for inflating awards when the defendant is wealthy . . . That does not make its use unlawful or inappropriate; it simply means that this factor cannot make up for the failure of other factors, such as reprehensibility, to constrain significantly an award that purports to punish a defendant's conduct."); *see also Honda Motor Co. v. Oberg*, 512 U.S. 415, 432 (1994) ("Punitive damages pose an acute danger of arbitrary deprivation of property, since jury instructions typically leave the jury with wide discretion in choosing amounts and since evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses.").

c.   **The Award Of Punitive Damages Is Grossly Excessive In Consideration Of Available Civil Penalties.**

California common law, the only basis for the punitive damages award, does not specify any civil penalties for trademark infringement.[1]  Even in comparable cases, such as those brought under the Lanham Act (which does not allow punitive damages), a prevailing party can only recover treble damages where the claimed infringement is found to be willful.  15 U.S.C. § 1117(b).  Not only is the Lanham Act's provision allowing the recovery of treble damages well within the single-digit presumption recognized in *State Farm*, it is also in accord with the Supreme Court's recognition of the "long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, triple, or quadruple damages to deter and punish."  *BMW*, 517 U.S. at 581; *Haslip*, 499 U.S. at 23-24.  At the very least, the Lanham Act's provision for treble damages for willful infringement is instructive of the maximum multiplier that could comport with due process in a similar action brought under California common law.

---

[1] Because the Lanham Act does not allow for an award of punitive damages, the jury's award of punitive damages must necessarily have been based on World Marketing's Fifth Counterclaim for Common Law Trademark Infringement.

QUIKSILVER'S MOTION FOR NEW TRIAL PURSUANT TO FED. R. CIV. P. 59

1      The punitive damages awarded by the jury are constitutionally excessive and

2   cannot stand.  It is the Court's duty in such circumstances to ensure that the award

3   comports with due process.  Accordingly, Quiksilver requests the Court grant a new

4   trial on this basis.

5                2.    **It Was Prejudicial Error For The Court To Allow World
                       Marketing To Introduce Evidence And Make Argument
6                      Regarding Quiksilver's Privileged Litigation Conduct In
                       Support Of Its Punitive Damages Claim.**
7

8      As explained in Section II-C(a) of the JMOL Motion, World Marketing

9   improperly based its claim for punitive damages on Quiksilver's conduct in this

10  litigation, including by attacking Quiksilver for filing a claim for a declaration of

11  non-infringement, by arguing that Quiksilver tried to destroy World Marketing's

12  business by issuing subpoenas during discovery to its retail accounts and bank, and

13  by claiming that World Marketing suffered $3,200,000 in lost sales as a result of

14  the lawsuit.  In fact, this theory—*i.e.*, that Quiksilver purportedly used the litigation

15  itself to harm World Marketing—was the only theory World Marketing could

16  concoct to support its claim for punitive damages and it, therefore, relied

17  extensively on such evidence and arguments, from opening statements,[2] to the

18  testimony of Neil Mossberg[3] and Jerry Mossberg,[4] through closing argument.[5]

19  _____

20  [2] (Magnuson Decl. Ex. 1 (Day 1 at 44:21-45:3 (WMI Opening Statement) ("They
    then made the injury worse by suing World Marketing, issuing subpoenas to its
21  retailers, its bank, its accountant, and turning this small company upside-down. . . .
    They can't disregard the rights of a small company. They can't drag it into a
    lawsuit. They can't subpoena its retailers, its bank and its accountant. They can't
22  turn a small family company upside-down and then expect to press "reboot" and
    just walk away. Because World Marketing cannot.")).)
23  [3] (*Id.* Ex. 2 (Day 2 Vol. 2 at 49:3-7 (Q.  In terms of what you are asking from this
    Court financially, what is it that World Marketing is seeking? A.  We're seeking the
24  amount of money that we lost, the amount of future business that we weren't able to
    do . . . I'm asking the jury to recognize that, while tied to specific product sales, that
25  that's not there, there were significant loss of sales to the company that coincide
    specifically with this entire thing."), 49:14-22, 49:14-50:21, 58:21-59:6) (N.
26  Mossberg Testimony)).)
    [4] (*Id.* Ex 14 (Day 5 Vol. 1 at 77:10-79:2 ("A. The damages have already been done
27  to my company. We had -- what Quiksilver did: They subpoenaed my customers.
    My customers -- my largest customers."), 83:13-24 ("The second situation is that
28  they already created damage to my company, um, in a sense that, um, my

                                    8                QUIKSILVER'S MOTION FOR NEW TRIAL
                                                     PURSUANT TO FED. R. CIV. P. 59

1  Under California law, and as argued at length in the JMOL Motion, litigation

2  conduct is absolutely privileged, cannot be commented on, and cannot serve as the

3  basis for a punitive damages award.  *See* Cal. Civ. Code § 47(b).  (*See* JMOL

4  Motion, at Section II-C(a) and cases cited therein).)  The punitive damages award

5  here, based on this improper evidence and argument, constitutes a violation of due

6  process, resulted in substantial prejudice to Quiksilver, and cannot be permitted to

7  stand.

8          3.      **It Was Prejudicial Error For The Court To Allow World
                   Marketing To Introduce Evidence And Make Argument**
9                  **Regarding Purported Harm Caused As A Result Of**
                   **Quiksilver's Litigation Conduct.**
10

11  Quiksilver is also entitled to a new trial on World Marketing's punitive

12  damages claim because the jury's award was based, at least in part, on World

13  Marketing's claims that the company had been damaged, including in the form of

14  "lost sales," as a result of Quiksilver's filing a lawsuit and subpoenaing its

15  customers.   Specifically, Jerry Mossberg was allowed to testify at trial that World

16  Marketing lost over $3,200,000 in sales because of the lawsuit and subpoenas—not

17  because of any alleged infringement.  (Magnuson Decl. Ex 14 (Day 5 Vol. 1 at

18  83:13-84:19, 115:7-21).)  He also testified that, upon receiving a subpoena, World

19  Marketing's bank said: "We're not sure what's going on here.  We gonna cut your

20  line down.  We're gonna review it every 30 days."  (*Id*.)  World Marketing then

21  relied on such evidence in closing, arguing that "[World Marketing's] day-to-day

22

23  projections for the company for 2012, which I think Mr. Blakely said was 8 million
    something -- well, actually, we only did less than $5 million"), 115:7-10 ("Q. How
24  has the business suffered? A. Well, our business -- our projection was to do $8.2
    million, and we ended up in 2012 doing less than $5 million.") (J. Mossberg
25  Testimony)).)

26  [5] (*Id*. Ex. 15 (Day 5 Vol. 2 at 33:19-21 ("And Quiksilver bullied World Marketing
    throughout this lawsuit. It subpoenaed its retailers, its bank, and even its
27  accountant."), 57:24-58:7 ("The effect of Quiksilver's bad faith and bullying has
    been devastating to World Marketing. It day-to-day operations have been disrupted,
    its credit line threatened, and its overall financial health damaged as a result of this
28  lawsuit."), 115:7-10 (WMI Closing Argument)).)

                                         9                QUIKSILVER'S MOTION FOR NEW TRIAL
                                                          PURSUANT TO FED. R. CIV. P. 59

1   operations have been disrupted, its credit line threatened, and its overall financial

2   health damaged as a result of this lawsuit." (*Id.* Ex. 15 (Day 5 Vol. 2 at 57:24-58:9

3   (World Marketing Closing Argument)).)

4   As Quiksilver's conduct in this lawsuit is absolutely privileged, any claim of

5   harm due to Quiksilver's litigation conduct is similarly barred by the litigation

6   privilege and should never have been heard by the jury.  But the testimony and

7   argument is improper for other reasons, as well.  For one, World Marketing did not

8   plead lost sales as a component of damages and this element of damages was not

9   disclosed in discovery.  In fact, prior to trial, World Marketing went so far as to

10  affirmatively abandon its claim for lost profits, instead deciding to pursue only a

11  reasonable royalty claim at trial.  *See QS Wholesale, Inc. v. World Marketing, Inc.*,

12  No. SA 12–CV–0451(RNBx), 2013 WL 1953719, at *3 (C.D. Cal. May 9, 2013).

13  Moreover, "lost sales," as opposed to "lost profits," is not a cognizable measure of

14  damages and is, therefore, completely irrelevant to any of World Marketing's

15  claims or damages.  Finally, and importantly, any alleged harm caused as a result of

16  this lawsuit—which World Marketing made no effort to prove at trial—has nothing

17  to do with the claimed trademark infringement and, therefore, cannot as a matter of

18  law serve as a measuring stick for punitive damages.  As the Supreme Court

19  recognized in *State Farm*, concerns regarding excessive punitive damage awards

20  "are heightened when the decisionmaker is presented . . . with evidence that has

21  little bearing as to the amount of punitive damages that should be awarded.  Vague

22  instructions, or those that merely inform the jury to avoid 'passion or prejudice' do

23  little to aid the decisionmaker in its task of assigning appropriate weight to evidence

24  that is relevant and evidence that is tangential or only inflammatory."  538 U.S. at

25  418.

26  Not only was this evidence allowed in at trial, the Court told the jury that

27  they could consider Jerry Mossberg's testimony regarding the alleged harm caused

28  by the subpoenas in determining "the motivation of the parties for the lawsuit."

QUIKSILVER'S MOTION FOR NEW TRIAL
PURSUANT TO FED. R. CIV. P. 59

1  (Magnuson Decl. Ex. 14 (Day 5 Vol. 1 at 115:7-21).)  This was just after Jerry

2  Mossberg testified that "[Quiksilver] was trying to put me out of business" by

3  initiating the lawsuit and serving subpoenas during discovery.  (*Id*. at 77:10-79:7.)

4  The impact of this improper evidence was overwhelmingly prejudicial and unfair to

5  Quiksilver.

6      There is no doubt but that this privileged, irrelevant and inflammatory

7  testimony and argument regarding purported harm had an appreciable impact on the

8  jury, particularly as it relates to the punitive damage award, was prejudicial to

9  Quiksilver, and warrants a new trial.

10          4.    **The Jury's Finding Of Malice, Fraud Or Oppression Is Against The Clear Weight Of The Evidence At Trial.**

11

12      As set forth in the JMOL Motion, World Marketing failed to present

13  sufficient evidence to support the jury's finding of fraud, oppression or malice in

14  connection with Quiksilver's purported trademark infringement.  Indeed, no

15  reasonable jury could conclude here that Quiksilver acted with fraud, malice or

16  oppression in infringing on World Marketing's VISITOR mark and, for this reason,

17  Quiksilver's JMOL Motion should be granted.  (*See* JMOL Motion at Section II-

18  C(b).)  But if there is any doubt as to whether there was substantial evidence to

19  support this claim, the Court should at the very least order a new trial.  A new trial

20  is warranted where the verdict is against the clear weight of the evidence.  *Molski v.*

21  *M.J. Cable, Inc.,* 481 F. 3d 724, 729 (9th Cir. 2007).  Indeed, the Court has a duty

22  to set aside a verdict even though it is supported by substantial evidence, if the

23  judge "is of the opinion that the verdict is against the clear weight of the evidence . .

24  . ."  *Gill v. Rollins Protective Svc's,* 773 F.2d 592, 594 (4th Cir. 1985).  Here, the

25  clear weight of the evidence supports a finding that Quiksilver did not, with malice,

26  fraud or oppression, attempt to deceive consumers into thinking its VSTR products

27  emanated from or were sponsored by World Marketing.  (*See* JMOL Motion at

28  Section II-C(b).)  A retrial is therefore warranted.

**B.      Quiksilver Is Entitled To A New Trial On World Marketing's Claim For Reasonable Royalty Damages.**

As the sole measure of "actual damages," the jury awarded World Marketing $125,000 in "reasonable royalties" that World Marketing purportedly lost due to Quiksilver's alleged trademark infringement.  (Dkt. No. 310 at 2.)  The jury's award, however, was based on prejudicial and irrelevant arguments and testimony, contrary to law, and against the great weight of the evidence.  A new trial on World Marketing's claim for reasonable royalty damages is warranted.

**1.      In Support Of Its Reasonable Royalty Damages Theory, World Marketing Relied On Prejudicial And Irrelevant Arguments And Testimony Designed To Confuse And Inflame The Jury.**

During the summary judgment phase of this litigation, World Marketing conceded that it could not prove any lost sales of VISITOR-branded goods.  On the basis of this concession, the Court held that World Marketing was "not entitled to any lost sales on VISITOR products."  *QS Wholesale, Inc. v. World Marketing, Inc.*, No. SA 12–CV–0451(RNBx), 2013 WL 1953719, at *3 (C.D. Cal. May 9, 2013).  The Court also held that World Marketing was not entitled to any monetary relief for corrective advertising, "goodwill damages," or a disgorgement of Quiksilver's profits.  *Id.* at **3, 6.  Consequently, the only trademark damages theory available to World Marketing at trial was for a hypothetical reasonable royalty.

In disregard of the Court's rulings, World Marketing relied on arguments and testimony throughout the trial that were irrelevant to its reasonable royalty damages theory and that contradicted its own judicial admissions that it had not lost any sales as a result of the alleged infringement.  Specifically, both Neil and Jerry Mossberg testified that World Marketing's sales had decreased significantly due to the lawsuit, and both explicitly asked the jury to award damages on the basis of alleged lost sales or a downturn in World Marketing's business.  (Magnuson Decl. Ex. 2

QUIKSILVER'S MOTION FOR NEW TRIAL
PURSUANT TO FED. R. CIV. P. 59

(Day 2 Vol. 2 at 49:3-7 (A. *We're seeking the amount of money that we lost, the amount of future business that we weren't able to do . . . I'm asking the jury to recognize that, while tied to specific product sales, that that's not there, there were significant loss of sales to the company that coincide specifically with this entire thing*.") (emphasis added), 58:21-59:6, 49:14-22, 50:8-2 (N. Mossberg Testimony); *id*. Ex. 14 (Day 5 Vol. 1 at 77:10-79:2, 83:13-24, 115:7-10 (J. Mossberg Testimony) ("Q. How has the business suffered? A. *Well, our business -- our projection was to do $8.2 million, and we ended up in 2012 doing less than $5 million.*") (emphasis added)).)

A shown above, World Marketing repeatedly presented testimony and arguments about alleged damage to World Marketing that had no bearing on a reasonable royalty, the only damages claim at issue in the case. By doing so, World Marketing "tainted and unfairly influenced [the] jury verdict" and "[a] miscarriage of justice would arise if the verdict were allowed to stand." *Clanahan v. McFarland Unified School Dist.*, No. CV F 05-0796 LJO DLB, 2007 WL 2253597, at **8-9 (E.D. Cal. Aug. 3, 2007).

2. **The Jury's Finding That World Marketing Was Entitled To Reasonable Royalty Damages Was Against The Clear Weight Of The Evidence.**

As argued in Section B of the JMOL Motion, there is insufficient evidence as a matter of law to support the hypothetical reasonable royalties awarded by the jury. Even more here, on a heightened standard, the clear weight of the evidence supports a finding that World Marketing is not entitled to reasonable royalty damages. For example, where there was no prior licensing relationship between the parties and no evidence of any prior agreements to license the trademark at issue to third parties, courts in this and other Circuits have rejected trademark reasonable royalty claims as a matter of law because they lacked the requisite reasonable certainty. In *Tokidoki, LLC v. Fortunate Dynamic, Inc.*, the parties had no history of licensing negotiations and the plaintiff had never previously licensed its trademark. No. CV

13

07-1923 DSF (PJWx), 2009 WL 2366439, at **14-15 (C.D. Cal. July 28, 2009). Accordingly, the district court held that "no basis exist[ed] for an award of reasonable royalties" because the plaintiff "could not show with reasonable certainty that royalties were lost." *Id.* Likewise, in *Quia Corp. v. Mattel, Inc.*, the court granted summary judgment on the plaintiff's royalty claim where the record contained no evidence of a prior license or licensing negotiations between the parties or of any current plans or timetables for licensing the plaintiff's mark to third parties. No. C 10–1902 JF (HRL), 2011 WL 2749576, at **6-7 (N.D. Cal. July 14, 2011). The Court also held that "[t]he mere possibility of a future license cannot create an issue of fact as to the availability of lost royalties." *Id.*[6]

Here, the trial record establishes unequivocally that there was no prior licensing relationship between World Marketing and Quiksilver and that World Marketing had never entered into any outbound licenses for the VISITOR mark. World Marketing's factual and expert witnesses admitted that World Marketing never had a licensing relationship with Quiksilver and that Quiksilver did not make an offer to license the VISITOR mark from World Marketing. (Magnuson Decl. Ex. 2 (Day 2 Vol. 1 at 82:9-12, 83:2-9, 85:3-7 (N. Mossberg Testimony); *id.* at Ex. 12 (Day 5 Vol. 1 at 27:13-16 (Varner Testimony)).) World Marketing's witnesses also admitted that, in more than 25 years of using the VISITOR mark, World Marketing had never licensed the mark to any third party. (*See id.* at Ex. 2 (Day 2 Vol. 1 at 81:2-8 (N. Mossberg Testimony); *id.* at Ex. 12 (Day 5 Vol. 1 at 25:9-26:5, 43:21-44:4 (Varner Testimony)).)

Another key requirement for a reasonable royalty award is that the licenses

---

[6]  *See also South Cone, Inc. v. Timex Corp.*, No. 99–CV–2384–L(AJB), 2002 WL 34450329, at *1 (S.D. Cal. April 10, 2002) (granting summary judgment on trademark royalty claim where there was "no licensing history between the parties whatsoever"); *accord, A & H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 208-09 (3rd Cir.1999) ("Even when the courts have awarded a royalty for past trademark infringement, it was most often for continued use of a product beyond authorization, and damages were measured by the license the parties had or contemplated.").

relied upon to determine the royalty must be comparable to the hypothetical license to which the parties would have agreed.  *Cf. ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 873 (Fed. Cir. 2010) (vacating "speculative" damages award in patent infringement lawsuit based on prior agreements that were not comparable to a hypothetical license for the patent-in-suit).  Indeed, admitting reasonable royalty opinions based on license agreements that are not sufficiently comparable is reversible error.  *Id.* at 873; *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1332 (Fed. Cir. 2009).  Dr. Varner, however, based his opinion on nothing more than a cursory review of trademark licenses with no connection to the VISITOR mark, without making any attempt to assess whether the licenses were in any way comparable.  (Magnuson Decl. Ex. 12 (Day 5 Vol. 1 at 21:6:22 (Varner Testimony)).)  Dr. Varner made no effort whatsoever to establish that any of the licenses he relied on were comparable to the hypothetical World Marketing-Quiksilver license.  His only apparent justification for relying on those licenses was that they also involved apparel (*see id.*), but asserting a general industry comparability is insufficient as a matter of law.  *Cf. Lucent*, 580 F.3d at 1328 ("Lucent's brief characterizes the four agreements as covering 'PC-related patents,' as if personal computer kinship imparts enough comparability to support the damages award."); *see also LaserDynamics, Inc. v. Quanta Computer, Inc.*, No. 2:06–CV–348–TJW–CE, 2011 WL 7563818, at **3-4 (E.D. Tex. Jan. 7, 2011) ("It is not sufficient to state that both patents cover optical disk drive technology.").

At the end of the day, World Marketing also failed to provide any legitimate basis for the jury to conclude that Quiksilver would have agreed to license the VISITOR mark from World Marketing.  As Quiksilver's damages expert, Scott Phillips, explained, a key assumption in any trademark license is that the licensee would achieve some type of economic benefit, such as increased sales or lower prices, as a result of taking a license to the licensor's mark.  (Magnuson Decl. Ex. 9 (Day 4 Vol. 1 at 117:1-15 (Phillips Testimony)).)  Dr. Varner offered no evidence

that Quiksilver's VSTR brand enjoyed any benefits whatsoever from its alleged misuse of the VISITOR mark.  (*Id*. at 122:1-133.)  And Mr. Phillips' own un-rebutted analysis demonstrated that the VISITOR mark did not enhance or otherwise benefit Quiksilver's VSTR products.  (*Id*. at 127:4-8.)

As discussed in Quiksilver's accompanying JMOL Motion at Section B, World Marketing's reliance on Quiksilver's offers to purchase the VISITOR trademark outright was misplaced since such offers are manifestly irrelevant to any purported license that the parties would have agreed to in a hypothetical negotiation.  World Marketing's own witnesses and counsel confirmed that an offer to purchase and an offer to license are in no way comparable.  As Mr. Phillips explained, an offer to purchase is "much more valuable" because it confers full ownership of the mark for an indefinite number of years as well as the rights to modify and adapt the brand over time.  (Magnuson Decl. Ex. 9 (Day 4 Vol. 1 at 124:13-125:18 (Phillips Testimony)).)

Lacking any factual basis to support the award of a trademark royalty in this case, the jury's award of reasonable royalty damages was against the clear weight of the evidence.  A new trial is therefore warranted.

**C.  Quiksilver Is Entitled To A New Trial On The Jury's Finding Of Willful Infringement.**

**1.  The Court's Instruction To The Jury On Consumer Confusion Is Contrary To The Law.**

At trial, World Marketing offered no survey evidence showing a likelihood of consumer confusion.[7]  Instead, it relied on the testimony of two witnesses, Philip Pelland and James Campbell, as evidence of purported "actual confusion."  Pelland testified that he was a seller of World Marketing's clothing to specialty stores and department stores.  (Magnuson Decl. Ex. 10 (Day 4 Vol. 2 at 5:21-6:9).)  Over

---

[7] Failure to provide a consumer survey showing a likelihood of confusion "warrants a presumption that the results would have been unfavorable." *James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc*., No. SACV 11–1309–DOC(ANx), 2013 WL 655314, *9 (C.D. Cal. Feb. 21, 2013) (*citing Playboy Ent., Inc. v. Netscape Commc'ns Corp.,* 55 F. Supp. 2d 1070, 1084 (C.D. Cal. 1999)).

Quiksilver's objection, Pelland went on to testify that while at a trade show, an unidentified attendee told him that he had seen a shirt "with the same name, Visitor." (*Id.* at 8:6-22.)[8]  Campbell testified that he was a clothing designer who sold clothing under a number of different brands, had known Mossberg for fifteen years, and had shared showroom space with him. (*Id.* Ex. 11 at 13:4-15:6.) Campbell went on to testify that he purportedly saw VSTR product in January of this year and thought it was a new line launched by Jerry Mossberg. (*Id*. 15:20-25; 16:7-18.)  During closing argument, World Marketing argued that both Pelland's and Campbell's testimony showed "there has been actual confusion." (*Id.* at Ex. 15 (Day 5 Vol. 2 at 45:3-13).)

After the jury was instructed and began deliberating, it submitted the following question to the Court: "The legal definition of the term 'consumer,' does it include buyers and retailers?" (*Id.* at Ex. 17 (Day 6 Vol. 1 at 43:21-23).) Ultimately, over Quiksilver's objection, the jury was instructed by the Court as follows:

> Consumers include all the relevant purchasers of the parties' goods.  When goods are sold both to the public and to wholesalers and retailers, those groups are both consumers of the product; however, note that the different groups may exercise different levels of care, and more sophisticated consumers may be less likely to be confused.

(*Id.* at 52:7-24.)

This instruction includes multiple prejudicial errors.  First, in the context of World Marketing's claims, consumers does not "include all the relevant purchasers of the *parties' goods*," as instructed by the Court.  Rather, in a forward

---

[8] Of course, this statement was pure hearsay, should have been excluded, and the jury should have been advised not to consider it as evidence of confusion.

infringement case, like this one, the jury must determine "whether the junior user is palming off its products as those of the senior user." *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129-30 (9th Cir. 1998).  Thus, the proper universe of relevant consumers is limited to "potential buyers of the *junior* user's goods or services." *Water Pik, Inc. v. Med-Systems, Inc.,* No. 10-01221, 2012 WL 27598 (D. Colo. Jan. 5, 2012); *see Quia Corp. v. Mattel, Inc.,* No. C 10–1902 JF (HRL), 2011 WL 2749576, *9 (N.D. Cal. July 14, 2011) (granting defendant's motion for partial summary judgment on forward confusion because "Plaintiff offers no evidence supporting a claim that any customers purchased [Defendant's product] based on a mistaken belief that it was affiliated with [Plaintiff's products.").[9]  The jury's task therefore was to determine whether Quiksilver's customers were likely to believe that VSTR products were manufactured or sponsored by World Marketing, not to determine whether there might be confusion among "all relevant purchasers of the parties' goods," including among those intimately familiar with World Marketing's VISITOR brand.

Second, contrary to the instruction given by the Court, wholesalers and retailers are not consumers.  The Ninth Circuit addressed this issue conclusively in *Rearden LLC v. Rearden Commerce, Inc.,* holding:  "the relevant group for showing confusion is the consuming public for the particular good or service—that is, consumers who are actually in the market for the good or service at issue."  683 F.3d 1190, 1124 (9th Cir. 2012).  In that case, the plaintiffs offered technology incubation services under the mark REARDEN.  Plaintiffs claimed that because these incubation services were not directed towards the general public, the "relevant

---

[9]  "By contrast, reverse confusion occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one." *Surfvivor Media, Inc. v. Survivor Prods.,* 406 F.3d 625, 630 (9th Cir. 2005).  Because the question in a reverse confusion case is confusion stemming from the senior user's use of the mark, the relevant consumers are the potential buyers of the senior user's goods or services. *M2 Software, Inc v. Madacy Enter.,* 421 F.3d 1073, 1079-80 (9th Cir. 2005).  The jury was not instructed on reverse confusion, as World Marketing abandoned any reverse confusion claim.

consuming groups" were not the start-up companies that hired plaintiffs, but rather "investors, businesses seeking strategic partnerships,  marketers, strategists, vendors, suppliers, and media outlets." *Id*. at 1213.  The Ninth Circuit rejected this definition; instead, "the relevant group for showing confusion is the consuming public for the particular good or service—that is, consumers who are actually in the market for the good or service at issue." *Id*.  It clarified:  "Just as the relevant consumer in a case involving a website selling luxury cars is a reasonably prudent person accustomed to shopping online, the relevant consumer for purposes of an incubation business is the start-up enterprise that hires (and pays) the incubator for its various services." *Id*. (citations omitted).  The court in *Rearden* noted that, at best, confusion on the part of potential non-consumers like retailers could be relevant, in only certain situations, to the "likelihood of confusion" inquiry.  *Id*. at 1214, 1216 (discussing retailers as "non-consumers").  The jury instruction was in error because it encouraged the jury to accept Pelland[10] and Campbell's testimony as evidence of actual consumer confusion.  It was not.

Nor is the testimony of Pelland and Cambbell probative as to whether consumers were confused.  *Rearden* suggests that non-consumer confusion is relevant only if it could reasonably:

> (1) turn into actual consumer confusion (i.e., potential consumers); (2) serve as an adequate proxy or substitute for evidence of actual consumer confusion (i.e., non-consumers whose confusion could create an inference of consumer confusion); or (3) otherwise contribute to confusion on the part of the consumers themselves (i.e., non-consumers whose confusion could influence consumer perceptions and decision-making).

---

[10] Moreover, Pelland's testimony regarding confusion was inadmissible hearsay and should never have been admitted into evidence or used, as World Marketing clearly did during argument, to show the truth of the matter asserted.

QUIKSILVER'S MOTION FOR NEW TRIAL
PURSUANT TO FED. R. CIV. P. 59

*Id.* None of these factors are present here. Pelland and Campbell are not potential VSTR customers. Nor are they an adequate proxy for the VSTR customer base. Pelland is a seller of World Marketing's products and Campbell is a fifteen-year acquaintance of World Marketing who works in the industry. Evidence of confusion from such interested parties possesses "very little probative value." *See Global Mfg. Group, LLC v. Gadget Universe.Com*, 417 F. Supp. 2d 1161, 1174 (S.D. Cal. 2006); *JL Beverage Co., LLC v. Beam, Inc.*, 899 F. Supp. 2d 991, 1005 (D. Nev. 2012).[11] Nor could Pelland and Campbell be expected to influence consumer perceptions and decision-making. "Attestations from persons in close association and intimate contact with [the senior user] do not reflect the views of the purchasing public." *Self-Realization Fellowship Church v. Ananda Church of Self-Realization,* 59 F.3d 902, 910 (9th Cir. 1995).

Because the jury could not, as a matter of law, consider the testimony of "confusion" by Pelland or Campbell as evidence of a likelihood of consumer confusion in this forward confusion case, their testimony should also have been excluded under Federal Rule of Civil Procedure 403 because the probative value of that testimony, if any at all, was substantially outweighed by the risk of unfair prejudice, confusion of the issues or misleading the jury. *See* Fed. R. Civ. Proc. 403. Of course, the prejudice of these statements increased exponentially due to the fact that the Court never instructed the jury on the difference between a forward and reverse confusion case.[12] Accordingly, because the jury instruction on the relevant

---

[11] The testimony of World Marketing's long-standing retail customers is similarly irrelevant, as none have ever sold VSTR products or has ever been confused regarding any affiliation between VSTR and World Marketing.

[12] This, too, constitutes grounds for a new trial in this case, as the jury was not properly limited in the evidence they were allowed to consider in assessing likelihood of confusion. The instructions regarding Federal trademark infringement and common law trademark infringement were absolutely silent on the fact that the likelihood of confusion must be assessed with regard to purchasers of VSTR products. (Instructions at 18-23.) This instructional error was also found on the verdict form, which did not list any of the elements of either claim. (See Verdict Form.)

QUIKSILVER'S MOTION FOR NEW TRIAL
PURSUANT TO FED. R. CIV. P. 59

1  "consumer" erroneously instructed the jury—on an issue that was clearly relevant

2  and extremely important to their ultimate decision—to consider World Marketing's

3  retailers and wholesalers along with consumers of VSTR products, the Court should

4  order a new trial in order to avoid the manifest injustice of an award that is contrary

5  to the law.

6             2.     **The Court Failure To Instruct The Jury On The Law**

7                    **Regarding The Failure To Conduct A Survey Constitutes An Error In Law.**

8         The jury, too, should have received an instruction concerning World

9  Marketing's failure to conduct a consumer confusion survey. The failure to provide

10  a survey on likelihood of confusion "warrants a presumption that the results would

11  have been unfavorable." *James R. Glidewell Dental Ceramics, Inc. v. Keating*

12  *Dental Arts, Inc.*, No. SACV 11–1309–DOC(ANx), 2013 WL 655314, *9 (C.D.

13  Cal. Feb. 21, 2013) (granting summary judgment to defendant); *Playboy Ent., Inc.*

14  *v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070, 1084 (C.D. Cal. 1999). Prior to

15  trial, Quiksilver proposed the following instruction: "A plaintiff's failure to

16  conduct a consumer survey, assuming it has the financial resources to do so, may

17  lead to an inference that the results of such a survey would be unfavorable." (ECF

18  No. 225 at 49.) When asked at trial whether World Marketing had performed any

19  surveys of consumer confusion, Jerry Mossberg responded: "I think when you had

20  your expert here -- it was taking a survey -- said it cost about $80,000. There's no

21  way I could afford to take a survey, spend $80,000." (Magnuson Decl. Ex. 14 (Day

22  5 Vol.1 at 104:23-105:3).) He then clarified: "We didn't do a survey. We couldn't

23  afford it." (*Id*. at 105:4-5.)

24         The jury proceeded to hear testimony that World Marketing did not perform

25  a survey and also heard evidence as to World Marketing's resources and ability to

26  pay for a survey. It alone was positioned to make the factual determination as to

27  whether World Marketing had the resources to perform the survey and, and if so,

28  infer that the results of such a survey would be unfavorable. The Court nonetheless

QUIKSILVER'S MOTION FOR NEW TRIAL
PURSUANT TO FED. R. CIV. P. 59

refused to give the requested instruction on this issue.  Because the Court did not

instruct the jury that it could make this adverse inference, the jury was incorrectly

instructed, resulting in prejudice to Quiksilver.

### 3. The Jury's Finding Of Willful Infringement Was Made On The Basis Of Improperly Admitted Evidence And Was Against The Clear Weight Of The Evidence

Even if World Marketing did establish a likelihood of confusion to support

its infringement claims—which, as demonstrated in Quiksilver's JMOL Motion, it

did not —Quiksilver is entitled to a new trial on the jury's finding that Quiksilver

willfully infringed the VISITOR mark.  Willful infringement "carries a connotation

of deliberate intent to deceive" and cannot be found where, as here, the defendant's

actions were not "willfully calculated to exploit the advantage of an established

mark."  *Lindy Pen v. Bic Pen Corp.*, 982 F.2d 1400, 1406 (9th Cir. 1992); *see also*

*Tokidoki*, 2009 WL 2366439, at **15-16 (no willful infringement where there was

no evidence that defendant sought "to cause confusion or to deceive purchasers").

Here, as discussed above, World Marketing relied on irreparably prejudicial

evidence about Quiksilver's litigation conduct to taint the jury's view of Quiksilver.

In addition to being improperly admitted, this evidence had no bearing on World

Marketing's allegations of willful infringement, *i.e.,* whether Quiksilver

intentionally sought to confuse or deceive consumers into believing that VSTR

products emanated from or were affiliated with World Marketing or VISITOR.

Moreover, the jury's finding of willful infringement was against the clear

weight of the evidence.  As discussed above, World Marketing introduced no

admissible evidence to even remotely suggest that Quiksilver deliberately intended

to confuse consumers into thinking its VSTR products emanated from World

Marketing.  Quite the opposite.  The trial record showed that Quiksilver strenuously

sought to avoid any conflicts with the VISITOR mark, developed the VSTR mark

through its own investments and goodwill, and had no interest or intention to make

consumers believe that VSTR was in any way produced by or connected with

QUIKSILVER'S MOTION FOR NEW TRIAL
PURSUANT TO FED. R. CIV. P. 59

1  World Marketing or the VISITOR brand.  (Magnuson Decl. Ex. _3 (Day 2 Vol. 3 at

2  13:25-14:15 (Tully Testimony)); *id*. Ex. 5 (Day 3 Vol. 1 at 41:12-25, 50:15-21

3  (McKnight Testimony)).)

4  **III.    CONCLUSION**

5          For the foregoing reasons, Quiksilver respectfully requests that the Court

6  vacate the jury's verdict and order a new trial pursuant to Rule 59 of the Federal

7  Rules of Civil Procedure.

8

9  DATED: August 19, 2013                    MICHAEL G. YODER
                                             MOLLY J. MAGNUSON
10                                           JEAN-PAUL P. CART
                                             O'MELVENY & MYERS LLP
11

12
                                             By: /s/ Michael G. Yoder
13                                               Michael G. Yoder

14                                           BRENT H. BLAKELY
                                             CINDY CHAN
15                                           BLAKELY LAW GROUP

16                                           Attorneys for Plaintiff and Counter-
                                             Defendant QS Wholesale, Inc. and
17                                           Counter-Defendant Quiksilver, Inc.

18

19

20

21

22

23

24

25

26

27

28