JS-6

O

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| **QS WHOLESALE, INC.,**<br><br>　　　　　　**Plaintiff,**<br><br>　　vs.<br><br>**WORLD MARKETING, INC.,**<br><br>　　　　　**Defendant.** | **Case No.: SA 12-CV-0451-DOC(RNBx)**<br><br>**ORDER**<br><br>**(1) DENYING IN PART QUIKSILVER'S MOTION FOR JUDGMENT AS A MATTER OF LAW;**<br>**(2) DENYING QUIKSILVER'S MOTION FOR A NEW TRIAL;**<br>**(3) GRANTING IN PART WMI'S MOTION FOR FEES; and**<br>**(4) DENYING IN PART AND GRANTING IN PART WMI'S MOTION FOR DAMAGES AND PREJUDGMENT INTEREST.** |

In this trademark infringement action, after a jury awarded World Marketing, Inc. ("WMI" or "Defendant"), $125,000 in compensatory damages and $3.5 million in punitive damages from QS Wholesale ("Quiksilver" or "Plaintiff"), the parties brought post-trial motions. Before the Court are four motions: (1) Quiksilver's Motion for Judgment as a Matter of Law (Dkt. 322); (2) Quiksilver's Corrected Motion for a New Trial (Dkt. 329): WMI's Motion for Attorney's Fees and Costs (Dkt. 321); and WMI's Motion for Enhanced Damages, Prejudgment Interest, Punitive Damages, Permanent Injunction, and Denial of Declaratory

Relief (Dkt. 320).  Oral arguments were presented to the Court on September 24, 2013.  After considering the moving papers and oral arguments, this Court rules as follows:

1) The Court DENIES Quiksilver's Motion for Judgment as a Matter of Law, except to the extent that it will reduce the punitive award amount to $375,000;

2) The Court DENIES Quiksilver's Motion for a New Trial;

3) The Court DENIES IN PART and GRANTS IN PART WMI's Motion for Post-Judgment Relief,

    a. Denying WMI's motion for enhanced damages;

    b. Granting WMI's motion for prejudgment interest;

    c. Granting WMI's motion for punitive damages, but only in the amount of $375,000;

    d. Granting WMI's motion for a permanent injunction;

    e. Granting WMI's motion for dismissal of Quiksilver's Declaratory Judgement claim; and

4) The Court GRANTS WMI's Motion for Attorney's Fees and Costs.

## I.    Background

Having spent a great deal of time together, the parties and the Court are familiar with the factual background of this case.  *See, e.g.,* Order Denying in Part and Granting in Part Partial Summary Judgment (Dkt. 180) ("Summary Judgment Order").

By way of a brief background, both Defendant WMI's VISITOR mark and Plaintiff Quiksilver's VSTR mark are registered for use in connection with men's clothing and apparel. WMI obtained registration in 1998 of the mark VISITOR in connection with men's shirts, pants, shorts, sports jackets, and t-shirts, while Quiksilver obtained registration in 2011 of the mark VSTR in connection with shirts. Defendant WMI began selling VISITOR branded clothing and apparel in 1987; Plaintiff Quiksilver began selling VSTR-branded goods on or about June 17, 2011.

### a.  Quiksilver attempts to buy the VISITOR mark from WMI

Quiksilver originally planned to use the name "Visitor" for its VSTR brand.   During development of the brand in 2009 and 2010, Quiksilver executives and agents referred to the

brand as "Visitor" or "KS Visitor," since it was inspired by the world travels of professional surfer Kelly Slater.  Quiksilver, however, learned in February 2010 that WMI had already registered the VISITOR mark for use in connection with clothing and apparel.

At that point, in April or May of 2010, Quiksilver reached out to WMI and attempted to purchase the VISITOR mark; between May of 2010 and February of 2012, the parties exchanged offers, but, ultimately, they did not agree on a price.

### b.  The present litigation

On March 8, 2012, after Quiksilver's VSTR line began appearing on the market, WMI sent Quiksilver a letter demanding that Quiksilver discontinue use of its VSTR mark. On March 21, 2012, Quiksilver filed the present Complaint (Dkt. 1) seeking a declaratory judgment, pursuant to 28 U.S.C. § 2201(a), "that Quiksilver's use of the VSTR mark does not infringe or dilute any valid and protectable trademark owned by [WMI], nor does it constitute unfair competition or false designation of origin." Compl. ¶ 22. WMI filed counterclaims for trademark infringement under the Lanham Act and pendant state law claims, seeking as relief (1) cancellation of the VSTR mark; (2) injunctive relief; (3) damages under the Lanham Act and state law claims; (4) Quiksilver's profits; and (5) attorney's fees and costs.  *See* Def's Answer and Counterclaims (Dkt. 15).

### c.  Motions for Summary Judgment and Pre-Trial Motions

The parties filed cross-motions for partial summary judgment on the issue of damages and on the appropriateness of declaratory and injunctive relief.  On May 9, 2013, after extensive briefing and a full hearing, the Court issued an order resolving the following issues:

1) Regarding damages,

a. WMI is not entitled to any damages for lost sales on VISITOR products;

b. WMI is not entitled to a disgorgement of Quiksilver's profits;

c. WMI is not entitled to any damages for corrective advertising;

d. WMI is not entitled to any damages under it Fourth Cause of Action (UCL);

e. WMI is not entitled to damages based on loss of goodwill; but

f. Summary judgment was DENIED as to "reasonable royalties."

2) Regarding injunctive relief, the Court found that WMI's counterclaim seeking an injunction was not moot.

3) Regarding declaratory relief, the Court found that Quiksilver's claim for a declaratory judgment of non-infringement was not moot.

Summary Judgment Order at 12.

Leading up to the July 9, 2013, trial, the parties each submitted several motions in limine regarding evidentiary matters, expert reports, and the measure of damages. In resolving these motions, the Court again rejected Quiksilver's argument that "reasonable royalties" would not be an appropriate measure of damages were WMI to prevail on its infringement claims, for the same reasons described at length in the Court's Summary Judgment Order. *See* Order Regarding Motions in Limine (Dkt. 285) at 2 (citing Summary Judgment Order at 5-10).

### d.  WMI Prevails at Trial and post-trial motions are filed

A six-day trial began on July 9, 2013, and concluded on July 19, 2013. After all arguments and witnesses were presented, and after being instructed (Dkt. 311), the jury completed a verdict form. They found that Quiksilver had engaged in trademark infringement under both federal and state law, that Quiksilver intentionally used its VSTR trademark "knowing it was infringement," that Quiksilver engaged in unfair competition under federal law, and that Quiksilver owed WMI a reasonable royalty of $125,000. The jury also found that WMI was entitled to prejudgment interest from the date of infringement, December 2011. Finally, the jury found that Quiksilver acted with malice, oppression, or fraud, awarding WMI punitive damages of $3.5 million. *See* Verdict Form (Dkt. 310).

The parties then submitted the present motions and argued them before the Court on September 24, 2013.

### II.    Discussion

### 1)  QUIKSILVER'S MOTION FOR JUDGMENT AS A MATTER OF LAW

A motion for judgment as a matter of law in a jury trial is governed under the same standards as a summary judgment motion, based upon the evidence properly admitted at trial.

*Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 772 (9th Cir. 1981).  Judgment as a matter of law may only be granted if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1203 (9th Cir. 1997).

Quiksilver makes three main arguments: (1) that the Court should vacate the jury's finding of infringement; (2) that the Court should vacate the award of reasonable royalties; and (3) that the Court should vacate the punitive damages award.

### a. Infringement

First, Quiksilver argues that the Court should vacate the jury's findings of infringement and unfair competition because there was insufficient evidence, even viewing all facts in the light most favorable to WMI, of a "likelihood of confusion."  Pl's JMOL Mot. at 6-11.

Regarding the test for likelihood of confusion, the Ninth Circuit considers eight "*Sleekcraft*" factors in its analysis: "[1] strength of the [plaintiff's] mark; [2] proximity of the goods; [3] similarity of the marks; [4] evidence of actual confusion; [5] marketing channels used; [6] type of goods and the degree of care likely to be exercised by the purchaser; [7] defendant's intent in selecting the mark; and [8] likelihood of expansion of the product lines." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011) (citing *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979)); *see also* 4 McCarthy on Trademarks and Unfair Competition § 24:39 (4th ed.).  However, "the list is not exhaustive," nor is it exclusive, and "[o]ther variables may come into play depending on the particular facts presented."  *Network Automation*, 638 F.3d at 1145; *see also Echo Drain v. Newsted*, 307 F. Supp. 2d 1116, 1123 (C.D. Cal. 2003) ("The presence or absence of a particular factor does not necessarily drive the determination of a likelihood of confusion.").

Quiksilver makes the singularly unpersuasive argument that WMI presented *no* relevant evidence supporting any of the *Sleekcraft* factors that are weighed in determining a "likelihood of confusion."  This despite extensive evidence presented at trial on the similarities of the marks VSTR and VISITOR in sight, sound, and meaning; Quiksilver's knowledge of the existence of WMI's "VISITOR" mark; the relatedness of the two companies' goods; evidence of actual

confusion regarding the marks by professional buyers; and evidence on the similarity of marketing channels used by the two companies.

Construed in the light most favorable to WMI, and particularly in light of the fact that, while no single *Sleekcraft* factor is dispositive, WMI presented extensive evidence on the above factors, the Court cannot find that "no reasonable jury" could have made a finding of infringement.

### b.  Reasonable Royalties

Second, Quiksilver argues that no reasonable juror could have found that there was a legitimate basis for the compensatory damages award of $125,000.  Here, Quiksilver restates, for the fourth time in a motion before this Court, all of its previously unsuccessful arguments against "reasonable royalties" as a measure of damages.  *See* Pl's JMOL Mot. at 11-16.  For the same reasons outlined in this Court's Summary Judgment Order, the Court rejects Quiksilver's argument.  *See* Summary Judgment Order at 5-10.  Reasonable royalties are a proper measure of damages in this case, and the Court finds that a reasonable juror could have determined the amount of those reasonable royalties to a reasonable certainty.

At trial, WMI presented evidence of a prior offer by Quiksilver to purchase outright the VISITOR mark, which represents an estimate of Quiksilver's and WMI's valuation of an indefinite right to use the mark.  Further, WMI's damages expert, Thomas Varner, presented evidence of different types of reasonable royalties that can be calculated based on two parties' licensing histories—royalties based either on a "running" tally of sales using the mark, or based on a "lump sum" valuation of the mark's estimated worth at a particular time.  He also presented evidence on licensing trends in the clothing industry.  The jury considered this evidence and calculated a figure that the Court finds neither arbitrary nor unreasonable in light of this evidence.

### c.  Punitive Damages

Third, Quiksilver argues that WMI's punitive damages award must be struck as a matter of law.  Pl's JMOL Mot. at 16-25.

### i.  Availability of Punitive Damages

Under California law, punitive damages are permitted when a plaintiff proves, by clear and convincing evidence, that the defendant acted with oppression, fraud or malice. Cal. Civ. Code § 3294(a). Oppression means "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of the rights or safety of others."12 Cal. Civ. Code § 3294(c)(2). "Fraud" means "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." Cal. Civ. Code § 3294(c)(3). And "malice" means "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." Cal. Civ. Code § 3294(c)(1).

Quiksilver first argues that there was no evidence submitted at trial to support the required finding of oppression or malice.  WMI counters that significant evidence was introduced at trial to show "despicable" and reprehensible conduct that a reasonable juror could conclude exhibited oppression or malice.  Examples of evidence presented at trial include:

> (1) Quiksilver's knowledge of WMI's ownership of the mark;
> (2) Quiksilver's attempt to buy the mark on three occurrences over three years, and, when that failed, Quiksilver's decision to go ahead with an infringing mark;
> (3) Quiksilver's knowledge that WMI was a small company, and its intimation that it might be a "rag-trade" company that could be bullied;
> (4) Quiksilver's internal attempt to cover its tracks by telling employees to stop pronouncing VSTR "visitor" and insisting, after the fact, that VSTR never stood for anything at all, while still marketing the mark to the public as pronounced "visitor";
> (5) Quiksilver's refusal to stop infringing activity after WMI asked it to stop; and
> (6) Quiksilver's continued sale of VSTR products, even as it represented to WMI that it had stopped selling products.

The Court agrees with WMI.  Based on the evidence presented at trial, construed in the light most favorable to WMI, a reasonable jury could conclude that Quiksilver acted with the requisite malice or oppression, and that punitive damages should therefore be awarded.

### ii.  Quiksilver's New Claim of Improper Evidence of Litigation Tactics

Quiksilver also argues that WMI's arguments at trial in support of punitive damages improperly focused on Quiksilver's litigation tactics—activities like filing the lawsuit, serving subpoenas, and allegedly scaring off WMI customers—and that, because such evidence is inadmissible and irrelevant to the question of malice, oppression, or fraud related to Quiksilver's actual infringement, the entire punitive award should be struck.  Pl's JMOL Mot. at 19-23.  As support for this argument, Quiksilver points to passages in WMI's opening and closing statements during which WMI emphasized the fact that Quiksilver sued WMI first, served subpoenas on customers and banks, and generally upended WMI's business throughout the litigation.  *Id.* at 19-20.  In addition, WMI's president Jerry Mossberg testified about the effects of the subpoenas on WMI—he stated that he lost business, customers were afraid to work with him during the lawsuit, and his bank began to question him.  *Id.*

Quiksilver is correct that the conduct of a party's counsel during litigation does not contribute to the measure of a damages claim.  *See Palmer v. Ted Stevens Honda, Inc.*, 193 Cal. App. 3d 530, 539 (Ct. App. 1987) (reversing a punitive damages award when "Plaintiff was permitted to testify, over objection, that in two and one-half years of litigation preceding the trial . . . he had fought sixteen law and motion matters, tying one and winning the other fifteen, three with sanctions, at a cost of some $56,000 in attorney fees"); *De Anza Santa Cruz Mobile Estates Homeowners Assn. v. De Anza Santa Cruz Mobile Estates*, 94 Cal. App. 4th 890, 921 (2001) (citing the "generally accepted rule of law that the manner in which a defendant conducts its defense cannot be the basis for tort liability").

However, unlike in those cases cited above, here WMI's references to litigation activity during trial were few and far between, and there was significant other evidence in support of the jury's punitive damages award.  Whereas in *De Anza*, "the evidence and argument in [the] case often strayed into areas improper for determination by a jury," and the appeals court observed that a "substantial portion of the [plaintiff's] case at trial" centered on the defendants' "filing motions and doing appeals," with "[c]onsiderable trial time. . . taken up with an examination of the merits of various demurrers and motions," 94 Cal. App. 4th at 918, here Quiksilver cites

only a few un-challenged isolated mentions of litigation activity, and one portion of testimony by Jerry Mossberg that was objected to on relevance grounds and received a limiting instruction. Accordingly the Court will not strike the punitive damages award on this ground.

First, almost all of WMI's trial argument on issues related to punitive damages was based on proper evidence, including Quiksilver's willful infringement of a known mark, Quiksilver's continued infringement, Quiksilver's arguably disingenuous attempt to tell employees and the public that VSTR never stood for anything while also exploiting the pronunciation "visitor" in trade publications, and Quiksilver's misrepresentations concerning the shutting down of the VSTR line. As discussed in the previous section of this Order, there was sufficient evidence for a reasonable juror to find malice or oppression.

Quiksilver is not correct that any passing mention of behavior that took place after the start of litigation automatically nullifies a punitive damages award. Indeed, in some cases, the California Supreme Court has found that "a sharp distinction between conduct before and after suit was filed would be undesirable," and that "[w]e trust that the jurors will be aware that parties to a lawsuit are adversaries, and will evaluate the [defendant's] conduct in relation to that setting." *White v. W. Title Ins. Co.*, 40 Cal. 3d 870, 886 (1985). Here, while WMI on a few occasions introduced testimony related to the effects of the lawsuit, there were separate, relevant reasons to do so. Quiksilver's counsel repeatedly argued at trial that WMI entered this litigation in bad faith, having "thrown itself in front of a bus" while hoping for a big payday, and Quiksilver also openly questioned WMI's motives for continuing to litigate after Quiksilver offered to give up the VSTR mark. Accordingly, Jerry Mossberg's testimony—the only testimony that Quiksilver objected to during trial that could be construed as bearing on the "litigation privilege"— was allowed in for a limited purpose, to speak to questions of motivation and credibility, and the Court stated as much to the jury. During Mossberg's testimony, the Court instructed:

> *I'm allowing this in evidence to show the*
> *motivation of all the parties for the lawsuit --*
> *Quiksilver's, when Mr. McKnight testified -- and I'm letting*

*it in to show the motivation for Mr. Mossberg.*

*. . . So this is for the very limited purpose to*

*show motivation for the lawsuit, credibility for all*

*parties.*

Trial Transcript (Dkt. 352) of July 18, 2013  at 115.

It is worth noting that Quiksilver never once, during the course of this litigation, made the argument that it is making now, and never once suggested that the case had strayed into impermissible and highly prejudicial questions of litigation conduct.   The Court does not highlight this fact to suggest that Quiksilver waived its objection,[1] but rather to show how rare and insignificant these comments were during trial, and how little they appeared to weigh on the ultimate question of malice or oppression decided by the jury in WMI's favor.

### iii.  Amount of Punitive Damages

A review of the constitutional limits California courts have imposed on punitive damages awards leads this Court to decrease the amount Quiksilver must pay to WMI from $3.5 million to $375,000.  As articulated in *State Farm Mut. Auto. Ins. Co. v. Campbell* , 538 U.S. 408 (2003) *,* and interpreted by the California courts, the constitutional "guideposts" for courts reviewing punitive awards are: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  *Simon v. San Paolo U.S. Holding Co., Inc.*, 35 Cal. 4th 1159, 1172, 113 P.3d 63, 70 (2005)

Here, the first factor—"reprehensibility"—counsels for some moderation.  Courts consider whether "the harm caused was physical as opposed to economic." *Simon*, 35 Cal. 4th at 1180.  Here, WMI's harm was only ever economic.  Courts also consider whether "the tortious

---

[1] While WMI makes the separate argument that Quiksilver *has* waived this particular objection, *see* Def's Opp'n at 21-22, the Court need not address this argument because, as described above, Quiksilver's argument fails on the merits.

conduct evinced an indifference to or a reckless disregard of the health or safety of others." *Id.* Again, here, Quiksilver did not disregard WMI's health or safety. Another question relevant to the "reprehensibility" factor is whether "the target of the conduct had financial vulnerability." *Id.* WMI, as a much smaller company, did have some financial vulnerability. Courts also consider whether "the conduct involved repeated actions or was an isolated incident." *Id.* While Quiksilver's infringing behavior stretched over two years, there was no longstanding pattern of similar behavior alleged or proved. Finally, courts consider whether "the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* Here, the jury found that deceit was intentional. Overall, based on the lack of physical harm, the lack of disregard for the health and safety of others, and the lack of a strong pattern of malicious or oppressive behavior, this factor suggests that Quiksilver exhibited low "reprehensibility."

The second factor—"proportionality"—counsels even more strongly for a reduction. "[F]ew awards exceeding a single digit ratio [between actual and punitive damages] will satisfy due process." *Simon*, 35 Cal. at 1182. In addition, past decisions and statutes approving ratios of 3 or 4 to 1 are "instructive." *Id.* Here, the jury determined actual damages to be $125,000. $3.5 million is 28 times larger than $125,000.

The third factor—comparable statutory penalties—is not overly instructive in this case. When a "tort duty closely parallels a statutory duty for breach of which penalty is provided," *Simon*, 35 Cal. At 1184, it is useful to look at the statutory penalty. Here, however, there is no corresponding statutory penalty associated with malicious or oppressive infringement.[2]

WMI urges the Court to consider the size and wealth of Quiksilver and the deterrent effect that a punitive award is meant to have. While the use of a defendant's wealth as a factor is not "unlawful or inappropriate," the *State Farm* court emphasized that wealthy defendants are equally entitled to due process and that "[t]he wealth of a defendant cannot justify an otherwise

---

[2] While the Lanham Act, 15 U.S.C. § 1117(a), allows a court to award treble damages when a defendant acts *willfully* in its infringement "if [the court] finds that lost profits are inadequate," such an award is compensatory in nature and "cannot be punitive." *Binder v. Disability Grp., Inc.*, 772 F. Supp. 2d 1172, 1182-83 (C.D. Cal. 2011).

unconstitutional punitive damages award." *State Farm,* 538 U.S. at 427-28.  Wealth cannot be "an open ended basis for inflating awards," and it cannot replace reprehensibility as a constraining principle. *Id.*

The Supreme Court of California has acknowledged that, in certain cases, "the defendant's financial condition may combine with high reprehensibility and a low compensatory award to justify an extraordinary ratio between compensatory and punitive damages," but for those cases "involving substantial compensatory awards, the level of deterrence may be limited . . . to that provided as a natural result of imposing damages over and above traditional compensatory damages, not from the imposition of sanctions in an individual case that are actually disabling to the defendant." *Simon*, 35 Cal. 4th at 1186-87.  Furthermore, when "the reprehensibility of the defendant's conduct is relatively low, the state's interest in punishing it and deterring its repetition is correspondingly slight." *Id.* at 1187.

Based on the factors outlined in *Simon*, the Court hereby REDUCES the punitive damages award to $375,000.  This number is based on a fairly low finding of "reprehensibility," a finding that $3.5 million is far too high proportionally to the actual damages verdict of $125,000, and a determination that $375,000 in punitive damages, along with the not-insubstantial compensatory damages award of $125,000, acts as a sufficient deterrent to prevent future misconduct while also staying within the bounds of constitutionality.

### 2) QUIKSILVER'S MOTION FOR A NEW TRIAL

Quiksilver moves for a new trial, *see* Pl's Mot. for New Trial (Dkt. 329), and WMI opposes, Def's Opp'n (Dkt. 332).  A new trial is proper if "the record contains no evidence in support of the verdict or if the district court made a mistake of law." *Equal Emp't Opportunity Comm'n v. Go Daddy Software, Inc.*, 581 F.3d 951, 962 (9th Cir. 2009). "[T]o find that a verdict was against the clear weight of the evidence, the Court must more than simply disagree with the jury's decision." *Chronicle Publ'g Co. v. Legrand*, 1992 WL 420808, at *8 (N.D. Cal. Sept. 3, 1992); *see Landes Constr. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371–72 (9th Cir. 1987) ("[I]n most cases the judge should accept the findings of the jury, regardless of his own

doubts in the matter," and order a new trial only if it reaches the "definite and firm conviction that a mistake has been committed.")

Quicksilver moves for a new trial, first, on the issue of punitive damages; second, on the issue of "reasonable royalties"; and, third, on the issue of willful infringement.

### a. Punitive Damages

First, Quiksilver argues that $3.5 million is constitutionally excessive.  The Court addressed this argument in the previous section, agreeing that $3.5 million is constitutionally excessive and decreasing the award to $375,000.  *See* Part II(1)(c)(iii), *supra*.  Accordingly, there is no need for a new trial on these grounds.

Second, Quiksilver argues that it was prejudicial error for the Court to allow WMI to argue in favor of punitive damages based on Quiksilver's litigation conduct.  The Court disagrees, and has addressed this argument in Part II(1)(c)(ii) of this Order, *supra*.

Third, Quiksilver argues that the jury's finding of malice, oppression, or fraud was against the clear weight of evidence at trial.  A new trial based on lack of evidence is proper only if "the record contains no evidence in support of the verdict or if the district court made a mistake of law," *Go Daddy Software, Inc*., 581 F.3d at 962, and the Court must "must more than simply disagree with the jury's decision." *Chronicle Publ'g Co. v. Legrand*, 1992 WL 420808, at *8 (N.D. Cal. Sept. 3, 1992).

As discussed in detail in Part II(1)(c)(i) of this Order, *supra*, WMI introduced significant evidence at trial to show "despicable" and reprehensible conduct that a reasonable juror could conclude exhibited oppression or malice, including:

> (1) Quiksilver's knowledge of WMI's ownership of the mark;
>
> (2) Quiksilver's attempt to buy the mark on three occurrences over three years, and, when that failed, Quiksilver's decision to go ahead with an infringing mark;
>
> (3) Quiksilver's knowledge that WMI was a small company, and its intimation that it might be a "rag-trade" company that could be bullied;

(4) Quiksilver's internal attempt to cover its tracks by telling employees to stop pronouncing VSTR "visitor" and insisting, after the fact, that VSTR never stood for anything at all, while still marketing the mark to the public as pronounced "visitor";

(5) Quiksilver's refusal to stop infringing activity after WMI asked it to stop; and

(6) Quiksilver's continued sale of VSTR products, even as it represented to WMI that it had stopped selling products.

Here, for the reasons discussed above and in previous sections of this Order, the Court DENIES Quiksilver's motion for a new trial on the issue of punitive damages.

**b. Reasonable Royalties**

Quiksilver also moves for a new trial on the issue of reasonable royalties. First, Quiksilver argues that WMI relied on improper evidence of damages that were not at issue in this trial—lost profits and lost goodwill—to support the jury's reasonable royalties award. The Court had previously precluded any damages claims based on lost goodwill or lost future earnings at the summary judgment stage. *See* Summary Judgment Order at 5, 10-11 (holding that WMI had conceded the issue of lost profits and had failed to present any evidence in support of its lost goodwill claims). Quiksilver argues that the testimony of Neil Mossberg and Jerry Mossberg improperly included mentions of harm to WMI's profits and goodwill.

However, the Court instructed the jury very specifically about what could be considered in a reasonable royalty analysis. Quiksilver argues that Jerry Mossberg's testimony about WMI's finances resulted in the jury's damages award, but the Court gave a limiting instruction immediately after that testimony:

*I'm allowing this in evidence to show the*
*motivation of all the parties for the lawsuit --*
*Quiksilver's, when Mr. McKnight testified -- and I'm letting*
*it in to show the motivation for Mr. Mossberg.*
*But there won't be the issue of lost profits*

*before you. There will be the issue, if you reach*

*liability, what is a reasonable royalty. And I'll instruct*

*you on that. So this is for the very limited purpose to*

*show motivation for the lawsuit, credibility for all*

*parties.*

July 18, 2013, Trial Transcript at 115.  Similarly, after Neil Mossberg's testimony during which Quiksilver argues he made a case for lost profits, the Court stated: "Let me instruct the jury. You are going to be given a measure of damages to consider if you reach liability, and that's the fundamental and first question, but if you did, it will be called the reasonable royalty, and you'll be give a number of factors to consider."  July 10, 2013, Trial Transcript, Volum II, at 59:7-13.

Accordingly, at the end of trial, the Court gave the following instruction: "In this case, the only form of actual damages that World Marketing can recover is called a 'reasonable royalty.' In order to award World Marketing a reasonable royalty, you must find the following: 1)World Marketing was not paid any licensing royalties from Quiksilver during Quiksilver's use of the VSTR mark; and 2) Quiksilver owes World Marking the amount of those lost royalties; and 3) There is a legitimate basis upon which to calculate the amount of those royalties to a reasonable certainty." Jury Instruction 27.

The jury heard voluminous evidence from WMI's expert, Dr. Varner, concerning reasonable royalty calculations and, after deliberating with a copy of the Court's instructions at hand, the jury wrote down its award on a verdict form that unambiguously reflected the Court's instructions:  "If you answered 'YES' to Question 1(a), Question 2, or Question 3, what amount of reasonable royalties, if any, do you find that World Marketing has lost due to Quiksilver's infringement or unfair competition?"  Verdict Form (Dkt. 310) at 2.  The Court will not now order a new trial based on Quiksilver's assertion that all of these instructions must have been misunderstood, and the jury must have relied on a few brief references to WMI's finances that were prompted by Quiksilver's own inquiry into the issue.

For the reasons stated above, the Court will DENY Quiksilver's motion on this issue.

### c. Willful Infringement

Finally, Quiksilver also moves for a new trial on the issue of the jury's finding of willful infringement.

### i. Response to Jury Question

First, Quiksilver argues that the Court's supplemental instruction to the jury on the term "consumer" was a prejudicial error of law.  The Court's initial Jury Instructions (Dkt. 311), based largely on the Ninth Circuit's Model Jury Instructions on Trademark Infringement, include multiple uses of the term "consumer."  After the jury was instructed and began to deliberate, they returned with a question to the Court about the meaning of "consumer" that asked "[d]oes it include [b]uyers and retailers?"  Jury Note #1 (Dkt. 313).  After hearing arguments from counsel for both parties on the issue, the Court sent the jury the following response:

> "Consumers" includes all the relevant purchasers of the parties' goods.  When goods are sold both to the public and to wholesalers and retailers, those groups are both "consumers" of the product.  However, note that the different groups may exercise different levels of care, and more sophisticated consumers may be less likely to be confused.

July 19, 2013, Trial Transcript (Dkt. 353) at 52.

Quiksilver argues that, in an infringement claim, relevant "consumers" cannot include buyers and retailers, citing *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1214 (9th Cir. 2012).  *Reardon* does not stand for the proposition Quiksilver offers.  *Reardon* rejected the idea that "those who sell to, as well as buy from, the entity" should be considered consumers.  *Id.* at 1214. It did not reject the well-established principle the "prospective purchasers of [a party's] goods," *id.*, include wholesale buyers and retailers *who are potential purchasers of the goods.  See, e.g. Abercrombie & Fitch Co. v. Moose Creek, Inc.*, 486 F.3d 629, 634 (9th Cir. 2007) ("relevant purchasers" were "professional commercial clothing buyers"); *Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1289 (9th Cir. 1992) ("confusion among

retailers and consumers is relevant" evidence of confusion); *AMF Inc. v Sleekcraft Boats*, 599 F.2d 341, 352 (9th Cir. 1979) (confusion "both in the trade and in the mind of the buying public" was relevant).

Quiksilver also argues that, because this is a *forward* confusion case, not *reverse* confusion, the relevant "universe of consumers" in a forward confusion claim should be limited to potential buyers of the *junior* user's goods or services (i.e. Quiksilver's), not the purchasers of "the parties' goods" as the Court instructed. Forward confusion occurs when consumers mistakenly associate a junior user's mark with that of a "well-known senior mark," *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1130 n.5 (9th Cir. 1998), while reverse confusion involves consumers dealing with the holder of a senior mark while believing that they are doing business with the junior mark holder. *Surfvivor Media, Inc. v Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005).

First, the Court notes that "the parties' goods" here means clothing. Both parties sell clothing. The Court did not make a mistake of law in instructing that "consumers" includes the "relevant" purchasers of such goods. Second, while Quiksilver cites *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073 (9th Cir.2005), for the proposition that, in a forward confusion case, the relevant consumers are only those of the junior user, in fact, in *M2 Software*, the court specified that the relevant consumers for M2's forward confusion claim included M2's (the senior user's): both music industry members and the general public. *Id.* at 1080, 1084-85. Indeed, *Abercrombie & Fitch Co. v. Moose Creek, Inc.*, 486 F.3d 629 (9th Cir. 2007), cites *M2 Software* as an example of a case in which the court "analyz[ed] degree of care with regard to senior mark holder's consumers in [a] forward confusion case." *Id.* at 634 n. 2.

### ii.  Lack of a Special Instruction Regarding Surveys

Second, Quiksilver moves for a new trial on the issue of "willful infringement" because the Court did not specifically instruct the jury that WMI's failure to provide a survey on likelihood of confusion could lead to an inference that the results of such a survey would be unfavorable to WMI. Prior to trial, Quiksilver proposed the following instruction: "A plaintiff's failure to conduct a consumer survey, assuming it has the financial resources to do so, may lead

to an inference that the results of such a survey would be unfavorable." Pl's Proposed
Instructions (Dkt. 225) at 49.

The Court will not grant a new trial on this issue.  The Court did not prevent Quiksilver
from bringing up the question of whether or not a survey was conducted, nor from further
exploring the question of whether or not WMI could have afforded one.  Counsel for Quiksilver
asked WMI founder Jerry Mossberg at trial whether World Marketing had performed any
surveys of consumer confusion, to which Mossberg responded: "I think when you had your
expert here -- it was taking a survey -- said it cost about $80,000.  There's no way I could afford
to take a survey, spend $80,000." July 18, 2013, Trial Transcript at 104:23-105:3.  He then
clarified: "We didn't do a survey. We couldn't afford it." *Id.* at 105:4-5.  In addition,
Quiksilver's counsel, at closing, encouraged the jury to make exactly the inference Quiksilver
wanted them to make regarding the lack of a WMI survey.

It was not necessary for the Court to instruct the jury on all reasonable inferences that
might be made based on the evidence.  As an initial matter, "survey evidence is not required to
establish likelihood of confusion" or necessary to prove trademark infringement.  *Cairns v.
Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1041 (C.D. Cal. 1998).  While "[a] plaintiff's failure to
conduct a survey, assuming it has the financial resources to do so, *may* lead to an inference that
the results of such a survey would be unfavorable," *id.*(emphasis added), Quiksilver has pointed
to no authority requiring that such an instruction be given explicitly to the jury.  It was the
Court's duty to instruct on the law, and allow the jury to make reasonable inferences itself.  *See
Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 476 (3d Cir. 1990)
("[T]he refusal of the district court to give the jury charge on failure to conduct a survey was not
error.").

### iii.  Evidentiary Objections

Third, Quiksilver restates its argument that the Jury's finding of willful infringement was
made on the basis of improperly admitted evidence of Quiksilver's litigation conduct and
against the clear weight of evidence.  For the reasons stated in Part II(1)(a) and II(1)(c)(ii) of this

Order, the Court finds that there was more than sufficient evidence to support a finding of infringement, and that Quiksilver's "litigation tactics" objections must fail.

### 3) **WMI's MOTION FOR ENHANCED DAMAGES, PREJUDGMENT INTEREST, PUNITIVE DAMAGES, A PERMANENT INJUNCTION, AND DENIAL OF QUIKSILVER'S DECLARATORY RELIEF**

#### a. Enhanced Damages

WMI seeks enhanced, treble damages pursuant to the Lanham Act.  Under 15 U.S.C. § 1117(a), when a defendant acts willfully in its infringement, the Court may award up to treble damages to the plaintiff "if it finds that lost profits are inadequate." *Binder v. Disability Grp., Inc.*, 772 F. Supp. 2d 1172, 1182-83 (C.D. Cal. 2011).

Here, while the jury found that Quiksilver acted willfully and intentionally, the Court does not find that the $125,000 verdict is "inadequate."  Potential damages in this case were severely limited after the summary judgment stage, when it was established as a matter of law that WMI was not entitled to any lost sales on VISITOR products, that WMI was not entitled to a disgorgement of Quiksilver's VSTR profits, that WMI was not entitled to corrective advertising, and that WMI was not entitled to goodwill damages.  *See* Summary Judgment Order.

The only damages issue for trial was the question of "reasonable royalties," and the Court instructed the jury in a very detailed manner on that claim.  After considering WMI's expert, who proposed several methods of calculating a royalty of up to $514,000, and after considering testimony that Quiksilver offered $125,000 to *buy* WMI's VISITOR mark, and after considering Quiksilver's argument that the appropriate amount of "reasonable royalties" would be $0, the jury found that Quiksilver owed WMI a reasonable royalty of $125,000.

While WMI urges the Court to second-guess the jury, accept the WMI expert's testimony, and also increase damages based on "loss of market presence"—a type of damages that sounds suspiciously similar to the one this Court ruled out as a matter of law at the summary judgment stage—the Court finds $125,000 reasonable, and does not find the verdict to be "inadequate."

WMI also urges the Court to increase damages in order to deter Quiksilver from future infringement.  However, "[a]n enhancement of damages may be based on a finding of willful infringement, but cannot be punitive." *Binder*, 772 F. Supp. 2d at 1182 (quoting *Taco Cabana Int'l Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1127 (5th Cir.1991)).  The punitive damages award in this matter serves as a sufficient deterrent, along with the injunctive relief discussed later in this Order.

Accordingly, the Court DENIES WMI's motion for enhanced damages.

### b.  Prejudgment Interest.

Second, WMI seeks prejudgment interest**.**  WMI seeks, and Quiksilver does not appear to oppose, prejudgment interest on its common law infringement claim as directed by the jury's verdict.  California state law allows for prejudgment interest "in the discretion of the jury."  *See* Cal. Civ. Code § 3288, and, here, the jury found that prejudgment interest was appropriate, beginning from December 2011.  Accordingly, the Court GRANTS WMI's motion and awards prejudgment interest on the $125,000 at a rate of 7% per year, *see* Cal. Const. Art. XV § 1, beginning on December 1, 2011.

Measuring from December 1, 2011, to January 7, 2013, this amount equals $18,383.75 ($125,000 x .07 x 2.101yrs = $18,383.75).

### c.  Punitive Damages

Third, WMI seeks punitive damages of $3.5 million.  For the reasons discussed in Part II(1)(c) of this Order, the Court finds that, while punitive damages are appropriate, $3.5 million is constitutionally excessive.  The Court instead GRANTS IN PART WMI motion for punitive damages in the amount of $375,000.

### d.  Permanent Injunction

Fourth, WMI seeks a permanent injunction forbidding Quiksilver from using the VSTR mark or any other mark confusingly similar to the VISITOR mark.  Quiksilver opposes this request, despite the fact that Quiksilver has represented to this Court on multiple occasions that the VSTR mark had been shut down, and that no future sales would be made.  A party seeking a

permanent injunction must satisfy a four-factor test before the Court may grant such relief. WMI must show that:

> (i) World Marketing has suffered irreparable injury;
>
> (ii) Legal remedies are inadequate to compensate World Marketing for the injury;
>
> (iii) A balance of the hardships is in favor of an injunction; and
>
> (iv) The public interest would be served by an injunction.

*See eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Regarding the first factor—irreparable injury—while there is some dispute over whether Ninth Circuit precedent holding that "[i]n a trademark infringement claim, 'irreparable injury may be presumed from a showing of likelihood of success on the merits,'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 877 (9th Cir. 2009), is still good law, *see Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 982 (9th Cir. 2011) ("Because this case does not require us to consider Congress's intent in enacting the Lanham Act, *Marlyn Neutraceutical*'s adherence to a presumption of irreparable harm in a trademark case is irrelevant to our current inquiry"), here there is no question that WMI has presented sufficient testimony to show that Quiksilver's VSTR goods continued to be sold—both directly on Quiksilver's website and through retailers—long after Quiksilver represented that they were off the market. Lingering uncertainties about the presence of infringing VSTR goods in the marketplace, along with the confusion that infringing VSTR goods are likely to produce in buyers who are familiar with the VISITOR mark on clothing, are sufficient to establish lingering harm that cannot easily be compensated with monetary damages.

Regarding the second factor—inadequate legal remedies—"[T]he requisite analysis for the [adequate remedy at law] factor ... inevitably overlaps with that of the [irreparable harm factor]." *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 2010 WL 5598337, at *18 (N.D. Cal. Mar. 19, 2010), *aff'd in part, vacated in part on other grounds,* 658 F.3d 936 (9th Cir. 2011).  Here, WMI has adequately demonstrated that the lingering threat of additional infringing VSTR products on the marketplace, along with the potential for infringing VSTR licensees, creates an uncertainty and a potential for confusion in WMI's business that is not easily

quantifiable.   The necessity of a multiplicity of future suits suggests that legal remedies are inadequate here.  *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1220 (C.D. Cal. 2007) ("[A] legal remedy is inadequate if it would require a 'multiplicity of suits.'")(quoting Douglas Laycock, *The Death of the Irreparable Injury Rule,* 103 Harv. L.Rev. 687, 714 (1990)).

Regarding the third factor—a balance of hardships—here the balance of hardships weighs heavily in favor of an injunction.  Granting an injunction would not impose a hardship on Quiksilver.  Quiksilver has represented to the Court that it has abandoned the VSTR mark. Despite Quiksilver's representations, VSTR product has continued to enter the marketplace, and continues to exist in places where it could cause consumer confusion.  An injunction would merely require Quiksilver to come into compliance with what it once stated had already occurred.  On the other hand, denying an injunction "would create a situation in which Plaintiff could only enforce its intellectual property rights by seeking [further] statutory damages," and "this would constitute a substantial hardship" to WMI.  *See Louis Vuitton*, 2010 WL 5598337, at *18.

Regarding the final factor—the public interest—the jury has found that VSTR infringes WMI's trademark, and the Court finds that an injunction protecting WMI's intellectual property rights would serve the public's interest.  *See Louis Vuitton*, 2010 WL 5598337, at *19 ("[A]n injunction protecting Plaintiff's intellectual property against Defendants' acts of contributory infringement would serve the public interest.").

In sum, the Court finds that all four *eBay* factors weigh in favor of issuing an injunction here.  Accordingly, the Court hereby GRANTS the following injunction:

"enjoining and restraining Quiksilver, its agents, servants, employees, attorneys, and all persons in active concert or participation with them, from using or seeking to register VSTR or VISITOR, or any other mark confusingly or deceptively similar to World Marketing's VISITOR mark, in connection with clothing and

apparel, including shirts, blouses, pants, suits, sports jackets, vests, shorts, T-shirt, and outerwear."

### e.  Dismissal of Quiksilver's Declaratory Claim

Fifth, WMI seeks a dismissal of Quiksilver's claim for a Declaration of Non-Infringement.  In light of the fact that a jury has determined that VSTR infringes WMI's VISITOR mark, the Court hereby GRANTS this motion and DISMISSES Quiksilver's declaratory relief claim with prejudice.

### 4)  WMI'S MOTION FOR ATTORNEYS' FEES AND COSTS

#### a.  Attorneys' Fees

WMI seeks attorneys' fees of $2,608,622.

#### i.  Entitlement to Fees

As a threshold matter, the Court finds that reasonable attorneys' fees should be awarded to WMI.  Fees may be awarded to the prevailing party pursuant to 15 U.S.C. § 1117(a) in "exceptional cases."   A trademark case "is exceptional for purposes of an award of attorneys' fees when the infringement is malicious, fraudulent, deliberate or willful."  *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1409 (9th Cir. 1993); *see also Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1384 (9th Cir.1984).  Such an award is "within the discretion of the trial court and will not be disturbed absent abuse of that discretion."  *Id.*

The jury found that Quiksilver's infringement was willful, and that it constituted "oppression, fraud, or malice" sufficient to warrant a punitive damages award.  While the jury's determination is not binding, it is instructive.  *See Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1111 (9th Cir. 1992), *cert. denied*, 506 U.S. 1080 (1993) ("[I]n awarding punitive damages . . . the jury specifically found that the defendants had acted with oppression, fraud, or malice. That finding qualifies this case as an exceptional one within the meaning of section 35 [of the Lanham Act] and so merits a fees award."); *see also Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 1999 US Dist. LEXIS 23246, at *8 (C.D. Cal. Nov. 15, 1999) ("Reasonable attorney's fees are appropriate in this case because the jury found that [defendant] had engaged in despicable conduct sufficient to award punitive damages under California law.").

Here, as discussed at length in the portions of this Order that deal with punitive damages, WMI presented more than sufficient evidence of willfulness, malice, or oppression on the part of Quiksilver.  WMI presented evidence showing that Quiksilver knew of WMI's mark, knew that VSTR as used by Quiksilver would likely infringe, went ahead and used the infringing mark, refused to stop when WMI requested it, and continued to sell VSTR clothing through its own website long after it had represented that the brand was "shut down" and that it was no longer selling VSTR goods.  Accordingly, the Court finds that this is an exceptional case under *Lindy Pen* and attorneys' fees are appropriate. [3]

### ii.  Fee Amount

According to the "lodestar" method of calculating fees, "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).  WMI requests fees according to the following chart:

| Attorney / Function | Hours | Billed Rate | Standard Rate | Amount |
|---|---|---|---|---|
| Neil K. Roman, Partner | 628.50 | $500 | $790 | $314,250 |
| Clara J. Shin, Partner | 533.10 | $500 | $715 | $266,550 |
| Hope I. Hamilton, Special Counsel | 1655.70 | $500 | $620 | $827,850 |
| Elizabeth L. Wang, Fifth-Year Associate | 956.40 | $350 | $490 | $334,740 |
| Kevin F. King, Fourth-Year Associate | 907.80 | $350 | $405 | $317,730 |
| Matthew Kellogg, First-Year Associate | 890.10 | $350 | $370 | $311,535 |
| Rohna R. Houston, Paralegal Specialist | 1054.00 | $205 | $340 | $216,070 |
| Seth F. Kalman, Senior Litigation Analyst | 37.10 36.60 | $265 $275 | $265 $275 | $9,832 $10,065 |

---

[3] WMI also makes the argument that Quiksilver's "abusive litigation practices" merit attorneys' fees.  The Court will not grant the motion on these grounds.

Mot. for Fees (Dkt. 321) at 15; *see also* Roman Decl. (Dkt. 321-1) ¶ 15, Ex. G.

The tasks represented by this chart are described in detail in WMI's filings.  *See* Roman Decl. ¶¶ 29–84.  They include extensive research and briefing related to discovery motions, summary judgment motions and cross-motions, pretrial briefing and briefing on issues raised during trial.  *See id.*  In addition, WMI attorneys conducted substantial discovery, including dozens of depositions, multiple sets of written discovery requests and responses, and significant discovery correspondence.  *Id.*  The case culminated in a six-day jury trial, spread over two weeks. *See* Mot. at 18.

WMI also represents that counsel has made a series of voluntary deductions in order to ensure that the fees requested are reasonable.  First, counsel from Covington & Burling LLP ("Covington") charged WMI hourly rates that were below standard rates charged by Covington staff based on seniority and experience, as reflected in the chart *supra*.  In addition, WMI subtracted approximately 15% off the total hours spent on the case, including exclusions from billing for the following:

> • the time of three paralegals who supported the litigation, including when the lead paralegal, Ms. Houston, was unavailable;
>
> • the time of an associate, Leslie Harvey, who, among other things, took and defended depositions, including those used at trial;
>
> • the time of two New York-based litigation support personnel, who assisted with collection and production of WMI's electronic documents;
>
> • all fees associated with World Marketing's unsuccessful ex parte application to compel the deposition of Mr. Buttonshaw (Dkt. 57);
>
> • all time of Ms. Wang, Mr. King, and Mr. Kellogg incurred during trial, notwithstanding these associates' contributions, which included preparing jury instructions, reading deposition transcripts in court, providing exhibits to witnesses and the Court, preparing witnesses to testify, tracking evidence, and conducting legal research;
>
> • all fees incurred by other firm staff, including research librarians who

assisted with such tasks as locating addresses where Quiksilver

witnesses could be served; and

• all fees incurred by Laurence Shiff, World Marketing's primary

outside counsel, who provided guidance and strategic oversight.

Mot. at 18; Roman Decl. ¶ 12.

Regarding rates, all partner and counsel time claimed by WMI was billed at $500 per hour, all associate time was billed at $350 per hour, and all paralegal time was billed at $205 per hour. Roman Decl. ¶ 21. These rates are comparable to, or at the lower end of, the range of rates that courts in this Circuit have found to be reasonable for the market. *See, e.g., Love v. Mail on Sunday*, No. CV 05-7798 ABC (PJWx), 2007 WL 2709975, at *8 (C.D. Cal. Sept. 7, 2007) (partner/counsel rates between $460 and $690 and associate rates between $305 and $460 reasonable); *POM Wonderful, LLC v. Purely Juice, Inc.*, No. CV 07-2633 CAS (JWJx), 2008 WL 4351842, at *4 (C.D. Cal. Sept. 22, 2008) (partner rates between $450 and $700 and associate rates between $275 and $425 reasonable).

Quiksilver does not dispute any specific bill or rate among all of the detailed and comprehensive records provided by WMI in relation to this motion.  When invited to do so by the Court at the hearing on this issue, counsel for Quiksilver suggested that it would not be "productive" to go line-item through the billing records.  Rather, in its papers, Quiksilver argues in broad, sweeping language that WMI billed unnecessary hours and pursued legal theories that were eventually dropped, suggesting that any work done on WMI's abandoned "reverse confusion" theory, it's "lost profits" theory, and its other alternative damages theories should not properly be subject to a fees motion.  Pl's Opp'n (Dkt. 335) at 23-25.  Quiksilver does not cite any specific hourly reports or specific tasks that the Court should consider "excessive," but rather implies that WMI counsel's decision to carry out discovery on legal theories of recovery that did not end up succeeding should be written off as bad or unnecessary lawyering.

The Court finds that the opposite is true.  Having reviewed the voluminous billing records and timesheets associated with this motion, the Court finds that WMI counsel appears to have properly explored all legal theories that could lead to recovery for WMI, abandoning those

for which discovery did not support recovery, and properly abandoning a reverse confusion theory that was likely mooted by Quiksilver's decision to discontinue the VSTR brand.  In addition, the Court notes that additional hours spent responding to duplicative motions filed by *Quiksilver*—restating, for example, the same unsuccessful "reasonable royalties" argument at summary judgment, after summary judgment, during motions in limine, and again post-trial—or dealing with the fact that, prior to trial, Quiksilver refused to stipulate to a single fact, *see* Pretrial Conference Order (Dkt. 203-1), or exchange proposed jury instructions, *see* Roman Decl. ¶ 74, should not result in a discount for Quiksilver on this end of trial.  To the extent that Quiksilver's litigation conduct increased the workload of WMI counsel, Quiksilver cannot now claim that the resulting workload should be beyond the scope of reasonable compensation.

Quiksilver's related argument at hearing, that WMI had overstaffed and overlawyered its case beyond what was reasonably necessary to achieve the desired result, is not a little counterintuitive.  In *defending* against an affirmative suit brought by Quiksilver and bringing related counterclaims, counsel for WMI had to address a series of exceedingly complicated and nuanced challenges to its case—not least of which involved making a novel legal argument about the appropriateness of "reasonable royalties," *see* Summary Judgment Order at 5-10, and proving infringement at trial, before a jury, on a difficult set of facts.  Quiksilver's implication— that perhaps WMI should have followed Quiksilver's example and staffed the case with the same resources that Quiksilver itself used—ignores the fact that Quiksilver lost on all claims at trial and WMI won.

In addition, Quiksilver argues that WMI failed to apportion out fees between recoverable Lanham Act claims and non-recoverable common law claims. Pl's Opp'n at 20-21.  Apportionment is inappropriate, though, when "the claims are so inextricably intertwined that even an estimated adjustment would be meaningless." *Gracie v. Gracie*, 217 F.3d 1060, 1069-70 (9th Cir. 2000).  Here, each of World Marketing's counterclaims is based on the same set of facts and required World Marketing to prove nearly identical elements—each infringement and unfair competition claim in inextricably intertwined.

Finally, Quiksilver argues that, "in light of the results obtained at trial," WMI should only recover a small portion of the fees spent litigating the case.  *See* Pl's Opp'n at 21-23.  The Court largely disagrees. "[I]n appropriate cases, the district court *may* adjust the 'presumptively reasonable' lodestar figure based upon the factors listed in *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 69–70 (9th Cir.1975)...."  *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1158 (9th Cir. 2002) (quoting *Intel Corp. v. Terabyte Int'l, Inc.,* 6 F.3d 614, 622 (9th Cir. 1993)).  The *Kerr* factors are: (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.  *Kerr,* 526 F.2d at 70.  "The court need not consider all . . . factors, but only those called into question by the case at hand and necessary to support the reasonableness of the fee award." *Cairns*, 292 F.3d at 1158 (citing *Kessler v. Assocs. Fin. Servs. Co. of Hawaii,* 639 F.2d 498, 500 n. 1 (9th Cir.1981)).

Here, in addition to the arguments discussed above, Quiksilver focuses on the eighth factor: the amount involved and the results obtained.  Courts must compare the relief ultimately obtained in an action to the relief originally sought in the complaint in order to determine the degree of the prevailing party's success, and ultimately, the size of the fee award. *See Fischer v. SJB-P.D., Inc.,* 214 F.3d 1115, 1119 (9th Cir. 2000) (citing *Farrar v. Hobby,* 506 U.S. 103, 114 (1992)); *see also Gucci Am., Inc. v. Pieta*, 2006 WL 4725707, at *3 (C.D. Cal. July 17, 2006).  In this case, WMI sought actual damages, injunctive relief, dismissal of Quiksilver's declaratory claim, and punitive damages on its infringement claims.  It succeeded in obtaining all of that desired relief.  There were no "unrelated" claims on which WMI failed to prevail, since all of its claims were "based on similar factual bases and legal theories" of infringement.  *See Community Assoc. for the Restoration of the Environment v. Henry Bosma Dairy,* 305 F.3d 943, 956 (9th

Cir. 2002).  WMI  has achieved actual damages and injunctive relief on all its Lanham Act claims.

At the same time, the Court notes that, regarding actual damages, WMI repeatedly stated that it sought "$514,000 in reasonable royalty damages." July 18, 2013, Vol. 2, at 33:22–23; *see also id.* at 55:9-12 ( "World Marketing is seeking what Quiksilver would have paid, and that's $514,000. . . ."); *id.* at 59:15-17 ("You'll be asked what amount of reasonable royalties you should award. And that's, as we heard Dr. Varner explain, $514,000.").  Ultimately, the jury awarded $125,000 in reasonable royalties.  While this represents a 75.7% decrease from the actual damages explicitly sought by WMI, the Court does not find that a 75.7% reduction of the lodestar figure would be appropriate in this case, since, as described above, WMI was successful beyond its claim for actual damages—counsel's work resulted in permanent injunctive relief and a successful defense against Quiksilver's claim for declaratory relief.  Rather, a further 30% reduction beyond the 15% already discounted by Covington would satisfy *Kerr.  See* 526 F.2d at 70; *see also Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) (the attorneys' fees sought must be "reasonable in relation to the success achieved").

This reduced figure, $1,826,035.40, is also more in line with *Kerr*'s twelfth factor, awards in similar cases.  *See Kerr*, 526 F.2d at 70.  In *Cairns*, for example, a Lanham Act case, the Ninth Circuit affirmed attorneys' fees of $2,308,000 for a successful defense.  While that award was higher than this one, the amount in controversy was significantly higher—the plaintiff was seeking $32 million in lost profits.  *Id.* at 1158.  In *Cairns*, the Ninth Circuit also cited approvingly another case, *Universal City Studios, Inc., v. Nintendo Co.*, 797 F.2d 70 (2d Cir. 1986), in which the court upheld an attorneys' fees award of $1,142,545 to a party that had won $150,908.97 in actual damages and $222,498.28 in punitive damages.  *Id.* at 77.

Accordingly, for the reasons stated above, the Court GRANTS WMI's motion and awards fees in the amount of $1,826,035.40.

### iii.  Costs

WMI seeks reasonable non-taxable costs in the amount of $197,833**.**  Quiksilver has not opposed this portion of the motion. Accordingly, after reviewing all the supporting documentation, the Court GRANTS WMI's motion and awards $197,833 in costs to WMI.

### III.     Disposition

For the reasons stated above, the Court rules and will enter judgment as follows:

1) The Court DENIES Quiksilver's Motion for Judgment as a Matter of Law, except to the extent that it will reduce the punitive award amount to $375,000;

2) The Court DENIES Quiksilver's Motion for a New Trial;

3) The Court DENIES IN PART and GRANTS IN PART WMI's Motion for Post-Judgment Relief,

   a. Denying WMI's motion for enhanced damages;

   b. Granting WMI's motion for prejudgment interest in the amount of $18,383.75;

   c. Granting in part WMI's motion for punitive damages, in the amount of $375,000;

   d. Granting WMI's motion for a permanent injunction as follows:

   "enjoining and restraining Quiksilver, its agents, servants, employees, attorneys, and all persons in active concert or participation with them, from using or seeking to register VSTR or VISITOR, or any other mark confusingly or deceptively similar to World Marketing's VISITOR mark, in connection with clothing and apparel, including shirts, blouses, pants, suits, sports jackets, vests, shorts, T-shirt, and outerwear;"

   e. Granting WMI's motion for dismissal of Quiksilver's Declaratory Judgement claim; and

4) The Court GRANTS WMI's Motion for Attorney's Fees in the amount of $$1,826,035.40, and Costs in the amount of $197,833.

IT IS SO ORDERED.

DATED:  January 7, 2014

_David O. Carter_
_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE